# GENERAL PROPRIETORS OF EASTERN DIVISION OF NEW JERSEY

*v.*

## WILLIAM M. FORCE'S EXECUTORS et al.*

[Decided October Term, 1896.]

1. A resolution of the General Proprietors of the Eastern Division of New Jersey that no surveys to be made in right of a dividend declared by the proprietors should comprehend water, rivers, brooks or creeks, without including a proper quantity of land on each or either side thereof, is broad enough to cover a fresh-water lake.

2. A survey of land of the General Proprietors of the Eastern Division of New Jersey under a warrant passes no title as between the proprietors and its own officer, surveyor-general or register, unless approved by the council of proprietors, and if the survey and return be such that it is manifest that the council would not have approved them, and such that the officer in whose favor they were made could not have compelled the council by legal proceedings to approve them, the return, so far as regards that officer, cannot be held valid.

3. A return by the surveyor-general of the General Proprietors of the Eastern Division of New Jersey on a survey of a pond alone in three instances, two to himself, which surveys united in himself the offices of surveyor-general and register, and both of which surveys purported to include land as well as water, and which, so far as appears, may have been made clandestinely and without the consent of the proprietors, and the third to another, who was a large individual proprietor of which the same might be said, is insufficient to show a waiver of the rule of the proprietors that no survey of land under a pond by itself should be made without the express consent of the council.

4. An appointment of a deputy surveyor-general of land of the General Proprietors of the Eastern Division of New Jersey ought not to have been made without the approval of the council.

5. The General Proprietors of the Eastern Division of New Jersey were the legal owners of all unappropriated lands in East New Jersey against which were outstanding warrants of location. The proprietors claimed that they had the exclusive right to all of the lakes, and that they were not subject to be appropriated by ordinary outstanding warrants. The power of appropriating them to warrants rested in the surveyor-general and the register, but more particularly, perhaps, in the surveyor-general, who was the officer who, by long-settled practice of the proprietors, had the power to make a "survey" either in person or by a deputy at the

* This case was omitted from its proper place.—REP.

request of a warrant-holder, and then to make a "return" to him, thereby appropriating a certain portion of the land to him in satisfaction of his warrant.—*Held*, that it was not competent for the surveyor-general and register, both of whom were also members of the executive committee of the council of proprietors, to make a survey and return on any lakes for their own benefit, and that such action was a clear breach of trust, from which they would not be permitted to take any benefit.

6. This was true, admitting that the holder of warrants had an absolute right to have them located on the lands of the General Proprietors of the Eastern Division of New Jersey.

7. The General Proprietors of the Eastern Division of New Jersey is a corporation, and the individual holders of the proprietary shares, though holding the legal title, are no more proper or necessary parties to a suit for an accounting and to recover the equitable title to lands than would be the individual stockholders in any other corporation.

8. If, on a bill by the General Proprietors of the Eastern Division of New Jersey for an accounting and to recover the equitable title to lands, the individual holders of the proprietary shares should be made parties, it would not be obligatory to make them parties complainant, but they might be made parties defendant, and, as such, would not be barred by the statute from testifying as to conversations or transactions had with the deceased defendant.

9. On a bill by the General Proprietors of the Eastern Division of New Jersey for an accounting and to recover title to lands, a paper found among defendant's private papers, and purporting to be a minute of the proceedings of the executive committee of the proprietors, was improperly admitted in evidence over the objection that it did not come from the possession of the complainant, and that there was no proof that it was ever adopted by the executive committee, or that it was the same which was read, if any was read, before the council of proprietors at a subsequent date.

10. Letters of one who was both the surveyor-general of the General Proprietors of the Eastern Division of New Jersey and a member of the executive committee, but whose duties did not authorize him to bind the proprietors except in matters of the actual survey and allotment of lands, are not admissible against the proprietors as to another matter.

11. One who contracted with the General Proprietors of the Eastern Division of New Jersey relative to hunting for vacant land and the sale thereof will not be permitted to claim under a construction of the resolution constituting the contract different from that which the proprietors were induced by his active efforts to put on it, or, at any rate, which with his acquiescence they did in fact put on it.

12. Under a resolution of the General Proprietors of the Eastern Division of New Jersey that the register proceed to have the records examined with a view to the locating and making sale of all unlocated lands, and that he should be entitled to compensation for such surveys to sixty per cent. of the lands so located or of the proceeds of sales thereof, the register was not entitled to commissions on a sale made before the adoption of the resolution.

13. No estoppel can arise against the General Proprietors of the Eastern Division of New Jersey because of acquiescence in an account presented under a resolution that the register proceed to have the records examined with a view to locating and making sale of unlocated lands, and that he should be entitled to compensation for such surveys to sixty per cent. of the lands located or of the proceeds of sales thereof, with an allowance for surveyors' fees that should not exceed twenty per cent. of the sum he might expend therefor on all sales made, where no irretrievable action has been taken by the register, based on the proprietors' silent acquiescence, and they acted as soon as they discovered the errors and ascertained their rights under the resolution.

14. Under the rule that the words of an instrument shall be taken most strongly against the party employing them, a resolution of the General Proprietors of the Eastern Division of New Jersey prepared by the register that the register proceed to have the records examined with a view to locating and making sale of all unlocated lands, and that he should be entitled to compensation for such surveys to sixty per cent. of the lands located or of the proceeds of sales thereof, with an allowance for surveyors' fees that should not exceed twenty per cent. of the sum he might expend therefor on all sales made, is confined to "unlocated lands," and casts the burden of expense in hunting for lands on the register, he to get back from the proprietors twenty per cent. of the sum expended.

15. One who appeals to a court of equity must do equity.

16. The measure of equitable damages which a *cestui que trust* is entitled to recover for a breach of trust is, at the option of the *cestui que trust*, the amount actually lost by the breach, or the amount which the trustee has gained thereby.

17. The liability to make good a loss resulting from a breach of trust participated in by more than one trustee is both joint and several, so that each trustee is liable for the whole loss.

18. The register of the General Proprietors of the Eastern Division of New Jersey and member of the executive committee is entitled to no compensation on a sale of land of the proprietors by him in breach of his duty to secure the best price he could get.

19. Three several methods of passing title to lands, in use for many years, by the Proprietors of East Jersey stated and explained. The *dictum* on that subject by the court in *Jennings* v. *Burnham, 56 N. J. Law (27 Vr.) 289,* commented on, doubted, and not followed.

————

On final hearing on pleadings and proofs.

The bill in this cause was filed on the 8th day of September, 1891, against William M. Force, the defendants' testator. It was based on the idea that the complainants, in their collective capacity, constituted a corporation capable of suing. On the 31st of October, 1891, the defendant, Force, interposed a plea set-

ting up that the complainants were not a corporation. Force died, and the present defendants were made parties before this plea was brought to the test of a hearing. The order making them parties directed that they should proceed according to law and the rules of the court within thirty days after service upon them of a copy of the order, and that in case of their failing so to do, the complainants might cause their appearance to be entered, and the plea of the said William M. Force, previously put in, deemed and taken as their plea. The defendants thereupon, within the thirty days, filed a plea to the same effect as that previously filed by their testator. The cause was brought to a hearing on that plea on the 20th of June, 1892, and it was overruled. An appeal was taken from the order overruling it, and it was affirmed in June, 1893. The defendants then demurred to the bill, and, on motion, the demurrer was stricken out. The defendants then answered, and the cause was brought to hearing on the pleadings and proofs.

The complainant, as a corporation, is composed of all persons holding a proprietary right or interest, commonly called a "propriety," in the territory of East New Jersey. There are twenty-four of these proprietary rights, and they have been divided again into what are called quarter shares, and the holding of a one-quarter share, or a ninety-sixth share in the whole, entitles the holder to a seat in the council of the proprietors. This is a meeting held twice a year at their office in Perth Amboy, under a written agreement entered into between them in 1725, by which all agreed to be bound by the action of this council, provided one-third, or eight full shares, were represented, either in person or by proxy. The officers of this corporation are a surveyor-general, a register and a treasurer.

The defendants' testator, William M. Force, was for nine years, and during the period of the transactions brought here in question, the register of the complainants. While acting as such officer he received large sums of money, proceeds of sales of land of complainants, which he admitted were received on account of the complainants; he also received other sums of money, proceeds of such sales, which he did not admit he received on account of the complainants, but which they claim were or should

have been received for their account; he also acquired the title to certain lands of complainants, which they claim he acquired wrongfully, and should be decreed to hold in trust for them.

The object of the bill is to call him to an account for these moneys, and to recover the equitable title of the lands in question.

With regard to the defence, it may be stated to be, generally, that the defendants claim that Mr. Force accounted in his lifetime to the complainants for all that was due them of the moneys which he admitted he received on their account, and, as to the other moneys, that they are not entitled to call on them to account for them, and the same as to the lands.

Mr. Force was register of the proprietors by annual election from 1881 to May, 1890, when he failed to be re-elected, and an investigation into the affairs of the complainants took place, which resulted in the commencement of this suit.

The case made, including the testimony of thirty-six witnesses and a large mass of documentary evidence, occupied fifteen days in its production. Counsel occupied five days in argument.

*Mr. Richard V. Lindabury,* for the complainants.

*Mr. Frederic W. Ward* and *Mr. Frederic W. Stevens,* for the defendants.

PITNEY, V. C.

In order to clearly understand the character of the issues it is worth while to advert briefly to the history of the complainants, their mode of conducting business, and the situation of their affairs at the time Mr. Force first became connected with them.

The complainants, as is well known, are successors in title to the original grantees of the executors of Sir George Carteret, of the eastern division of New Jersey. The twelve original grantees conveyed an equal undivided one-half to twelve other proprietors, and the property has ever since been held in shares of one-twenty-fourth each. In 1676 Sir George Carteret, and four other persons who were the grantees of Lord Berkeley, his original tenant in common of the whole province, entered into what is known in history as the *quinti-partite* deed (*1 N. J. Arch. 205; Leam.*

*& Spi. 61*), by which they agreed to divide the Province of New Jersey into two parts by a line which was described as running from the northerly branch or part of the Delaware river, and the most northerly point or boundary of the whole tract, agreed upon and called the north partition point, and from thence southward by a straight line to the east side of Little Egg Harbor, which was fixed as the south partition point. This division line was finally established in 1743 by the running of what is called the Lawrence line, under an act of the legislature of 1719. *Allin. L. p. 43.*

Prior to the act of 1719, and the running of the Lawrence line thereunder, the true division line between East and West Jersey was, of course, unknown, and numerous surveys and returns had been made by the East Jersey Proprietors west of where it was finally established, and *vice versa* by the West Jersey Proprietors east of that line, and the object of the act of 1719 was not only to have the line run and established, but to settle and quiet all titles under the mixed surveys. In point of fact, all the southern and most of the western part of Morris county was located before 1719 and held under West Jersey patents or locations.

George Keith, on the part of the East Jersey Proprietors, had previously, in 1687, run a line from Little Egg Harbor north-westerly as far as the Raritan river, the course of which line was farther west than the Lawrence line, and which Keith line now forms the boundary between Burlington and Ocean counties. The wedge-shaped piece formed by this line and that of Lawrence has been called the "gore." The Lawrence line crossed the Delaware river at its present terminus, and ran into and across Pennsylvania to a point on the Delaware at latitude forty-one degrees and forty minutes north, which was then the recognized northerly point of the province. This northerly point was subsequently, in 1769, fixed at the rock on Carpenter's Point, at the mouth of the Navesink river, considerably farther south and east of the original terminus of the Lawrence line. This change of boundary between New York and New Jersey led to a claim by the West Jersey Proprietors for a relocation of the division line, and, though no line was ever run in accordance with this claim, a second gore was claimed east of the Lawrence line at its south-

erly end, and some locations of land were made as late as the beginning of this century east of the Lawrence line in Ocean (then Monmouth) county, under West Jersey warrants. The Lawrence line, however, was finally determined to be the true line of the division, in the case of *Cornelius* v. *Giberson, 25 N. J. Law (1 Dutch.) 1.*

The usual mode adopted by the proprietors for passing title, after the surrender of governmental powers, was by issuing warrants or rights of location, which entitled the holder to have a certain number of acres set off to him in severalty wherever he might choose to locate them, if the warrant of location was general and unrestricted. In some instances, however, it was restricted to certain localities. These warrants of location, which came to be called simply "warrants" or "rights," were usually issued by way of dividends to each of the proprietors according to the amount of his holding, and when issued were credited to the proprietor on a book called the warrant-book, and as often as any land was located under them the party who had credit for so many acres was charged with the amount actually located. The fact that the most usual occasion of issuing these warrants was by way of dividends among the proprietors resulted in the process being termed by the courts a mode of partition among the proprietors. *Arnold* v. *Mundy, 6 N. J. Law (1 Halst.) 11; Den* v. *Sharp, 4 Wash. C. C. 609; Baeder* v. *Jennings, 40 Fed. Rep. 199; Estell* v. *Land Company, 35 N. J. Law (6 Vr.) 235; Jennings* v. *Burnham, 56 N. J. Law (27 Vr.) 289.*

This making dividends among the proprietors was not, however, the only occasion when they issued warrants of location. The records, since 1760 at least, show a great number of instances, one as late as 1859, where warrants were issued directly to outside parties, not proprietors, on sale by the proprietors, at auction or otherwise, for a moneyed consideration. The proprietors sometimes put up at auction for sale general warrants of location, and sometimes made such sales without auction. On other occasions they sold particular tracts of land to outside parties by private contract, and in such case the machinery adopted was to issue a general warrant of location for a large number of acres to one or more trus-

tees to hold in trust for the proprietors, and then direct the trustee to have a certificate of survey and return made in the usual way to the trustee, and a deed by him to the purchaser of the particular tract of land. In other words, the mode adopted of issuing a warrant to Charles E. Noble, trustee for the proprietors, under consideration in *Jennings* v. *Burnham, 56 N. J. Law (27 Vr.) 289,* was one which had been in use by the proprietors on many occasions for a long period of years, and numerous titles in this division of the state depend upon them. In fact, the warrant of location for ten thousand acres under which the plaintiff claimed in *Cornelius* v. *Giberson, 25 N. J. Law (1 Dutch.) 1,* was issued to Newell, DeBow and Brinley, in trust for the proprietors (*25 N. J. Law (1 Dutch.) 2; Minutes Council of Proprietors B. 308*), and received the approval of the supreme court. I must therefore presume that if the custom just mentioned had been proven in the case of *Jennings* v. *Burnham,* and the attention of the court called to the decision in the case of *Cornelius* v. *Giberson,* the title held under Noble would have received the approval of the court. For it must be observed that the mode of severing titles by partition, which was approved in the line of cases first referred to, is one resting entirely in the custom of the proprietors, and is not in accordance with the course of the common law. It has, indeed, been finally recognized by our courts without proof, but it must, originally, have been proven in the courts in the same manner as any other local custom must be proven.

While on this topic I cannot refrain from saying that owing to the fact that a large part of the land in the northern part of New Jersey is wooded, mountainous and unenclosed, it has frequently been necessary in suits of ejectment or trespass involving title, in the northern counties, to trace the title back to the proprietors, and I have never heard the point taken that it was necessary in so tracing title to prove that the person to whom the warrant of location was issued was one of the proprietors, but counsel and parties always, according to my recollection, relied simply upon the production of a "survey" and "return" under a warrant to whomsoever issued as being sufficient to pass the title.

The third section of the act of 1787 (*Rev. 1877 p. 599; Gen. Stat. p. 1972 § 3*) seems to dispense with any proof of that sort.

Besides, these warrants of location were assignable, and were, in fact, frequently assigned by the original warrantee to other persons not holders of any proprietary right, and such deed of assignment was made independent of their proprietary rights, and did not affect the same.

In the case in hand, as will hereafter appear, the custom to which I have referred is fully proven, and also the fact that Mr. Noble was one of the proprietors at the time of the issuing of the warrant in question, and I shall therefore hold, for present purposes, that titles made under his warrant are good.

In addition to the method of making title by locations under warrants, the proprietors also, on many occasions, made title by direct conveyance, executed by their president, under their seal, and numerous titles are held under such conveyances.

The records at Perth Amboy show that, in addition to divers sales of land made in the manner just stated, there have been fourteen regular dividends made among the proprietors in proportion to the amount of their several interests, the last one being made on the 20th of May, 1856. For these dividends warrants of location were issued and were transferred by deed from the original proprietors to other parties and became a matter of merchandise, and, under them and other warrants and direct conveyances, practically all the land of any value in East Jersey subject to location had been located, so that, prior to 1870, warrants were selling at from thirty-five to fifty cents an acre, and about 1879 there were outstanding warrants for thirty-five hundred acres, the ownership of which, in general, is to be found and ascertained only on the books in the office at Perth Amboy.

There were, however, considerable tracts of land on the sandy beach or islands along the shore, separated from the mainland by inland waters, which it was known by the proprietors generally had not been located. These had, in the main, been considered not worth locating. A part of these shore or beach lands was covered by two or three large patents or locations—notably that of Daniel Coxe, under consideration, in *Baeder* v. *Jennings,*

*40 Fed. Rep. 199,* and in *Burnham* v. *Jennings, supra*—the validity of which was disputed by the proprietors.

In addition, there were to be found through the unenclosed, wooded and mountainous regions of Morris, Sussex and Passaic counties, little irregular-shaped pieces and strips of land of little value, which had been omitted in the location of the larger tracts owing to the irregular shape of the actual locations. These had been, from time to time, hunted up and located by the old surveyors of those counties and had become very rare. There were, in addition, several small inland fresh-water lakes, which had never been located properly under warrants. This was due at first to the fact that they were considered of no value and not worth expending warrants of location upon, and, later on, to the settled policy of the council of proprietors, shown by a series of resolutions adopted by them, the last and most emphatic in 1871, and by instructions to the deputy surveyors, "not to locate any warrants upon ponds or beach or shore property;" and prior to and about the time when Mr. Force became register, the council of proprietors had offered for sale, and had actually sold, several of these lakes and received a large consideration in money therefor. In one instance they compelled a party, who had located one of these lakes under general warrants, to pay them a sum in cash for a confirmatory release. These lakes began to appreciate in value about the year 1870, so that by the acre they were worth many times more than the selling price by the acre of warrants of location. This was due to the fact that the holders of the warrants appreciated the situation, and the deputy surveyors were forbidden to locate general warrants on natural ponds and lakes.

It may be worth while here to notice briefly the mode of locating land under a warrant of location. The owner of the warrant having chosen his land, applies to the surveyor-general to survey it for him, but as it was impracticable for the surveyor-general in person to make all these surveys, the practice has been from early times for that officer to appoint in various parts of the domain deputy surveyors, and then for the holder of the warrant to go to one of these deputy surveyors and employ him to actually survey the land, and then to "certify that at the request of the

warrant-holder he had surveyed the land," giving its metes and bounds and contents, with a map and computation of contents annexed, and send that certificate to the surveyor-general. That paper, though, strictly speaking, a certificate of survey, came to be called simply a "survey." Then the surveyor-general, having examined the document and verified the accuracy of the survey and computation, made a certificate, which is called a "return," of the land so surveyed to the holder of the warrant, and handed that to the register, who charged the number of acres contained in it against the account of the holder of the warrant on the warrant-books of the proprietors. In order to validate this proceeding of the surveyor-general, his work should be approved by the proprietors in council assembled, and when so approved and the certificate recorded and handed to the holder of the warrant, the title to that land became vested in him.

I come now to the facts of this case.

At the semi-annual meeting of the council of proprietors in May, 1877, Professor George H. Cook, of New Brunswick, appeared as the owner of one-quarter of a share, and took his seat as such in the council.

At the next semi-annual meeting William M. Force was admitted to a seat in the board as the owner of a sufficient share of "propriety," as it is called. At that time Monroe Howell was surveyor-general and J. Lawrence Boggs was register.

Shortly before that an old map of the Lawrence line had been found, which enabled its true location to be traced with certainty, and action had been taken by the council for hunting up vacant lands in Monmouth and Ocean counties, and also with a view to test the title of parties holding under West Jersey locations east of the Lawrence line.

Shortly after Messrs. Cook and Force took their seats in the council moneys were appropriated for surveys in Ocean and Monmouth counties, and maps of surveys of land in Ocean county were made and presented, and applications for the purchase of lands were made and referred to the president, with the surveyor-general and register, and measures were taken to have plottings and surveys made to hunt for vacant land, and in 1879 a resolution was passed "that the *surveyor-general be ordered to make no*

*returns on individual rights of lands heretofore surveyed at the expense of the board* [council]," and at that time, 1879, a permanent executive committee was appointed, composed of the surveyor-general (Mr. Howell) and Messrs. Force and Charles E. Noble, who had recently taken his seat in the council.

About this time (1879) Professor Cook and Mr. Force manifested great interest in the affairs of the proprietors, and considerable activity in promoting their interests, and were, together with a Mr. Russell, who, the evidence shows, was acting in concert with them, appointed on several committees of investigation. One was a committee to investigate and report as to the rights of the proprietors to lands under water; another on rules and regulations; one on tidewater lands, and one on books and papers. In each of these capacities they made separate and quite lengthy written reports. The one on rules and regulations reported eight rules, the seventh of which was

"that the owners, heirs, executors, administrators and assigns of all such proprietors having dividends of rights of locations unsatisfied shall have the same rights and privileges, force and effect, as when such dividend was previously originally declared and recorded, and that all resolutions to the contrary be rescinded."

These rules were adopted by the council, and the significance of the one just quoted will appear in connection with the fact, developed at the hearing, that at and about that time Mr. Force, having, as a proprietor and member of the committee on books and papers, access to the records of the proprietors, had ascertained the ownership of the different outstanding warrants of location, and was engaged in buying them up, having the title made partly to Professor Cook, partly to Mr. Russell and partly to himself, and, in the main, at his own expense.

The effect of the rule just referred to would be to revoke the resolution of 1871, refusing to make surveys on ponds or beach or shore properties on individual rights, and that of 1879, that no warrants on individual rights be laid on lands heretofore surveyed at the expense of the board.

Another of the rules and regulations so reported was as follows:

"*Resolved,* That an executive committee of not more than three members be appointed or chosen who may, during the intervals between the meetings of the board, have charge of its interests, with full power, under the established rules, *to make negotiations, sales and contracts in the interest of the board of proprietors,* jointly or otherwise."

The surveyor-general (Mr. Howell), Mr. Force and Mr. Noble were appointed on that committee, and Mr. Force acted as its clerk. Later on, the president of the council and the surveyor-general, for the time being, were made permanent members, and in that way the committee was raised in numbers to five.

From that time the executive committee took charge of all the affairs of the proprietors, and transacted all their business, and to it was particularly committed, by divers resolutions, the sales of all lands under water, and the different sales presently to be mentioned were negotiated by it. No record of its meetings or actions was entered in any separate book, but whatever original record now exists is in the shape of memoranda in Mr. Force's handwriting on loose slips of paper. At each semi-annual meeting of the council that committee made a report, apparently in writing, which included divers resolutions adopted by the committee, and when those resolutions were approved by the council they were written out at length in the minutes of the council by Mr. Force as register.

In 1880 the council ordered a deed to be made to Mrs. Truesdell for Decker pond, in Sussex county, at $10 an acre, and for Three-cornered pond (Lake Como), Ocean county, to another party for $2,000. At the same time the executive committee reported as follows:

"Your committee would respectfully report that at an early day after their appointment they made examinations of the beach lands lying south of Point Pleasant, in company with S. S. Osborn, deputy surveyor, and became satisfied that there was a field open for profit to the proprietors in unappropriated lands, and more especially so from the improvements the new land association have in contemplation, as well as the early extension of the railroad. The deputy surveyor assured your committee that at an early day buyers would make distinct proposals for purchases to the extent of from $8,000 to $10,000, as he had been assured by them. Certain of these lands have been surveyed and are ready for a return to be made for them to the board of proprietors."

The committee appear also to have ordered a search as to the title of lands at Point Pleasant, which is the northerly end of the beach which separates Barnegat bay from the ocean. Also as to the rights of the proprietors in Lake Hopatcong, Stanhope reservoir, &c.

In 1881 the executive committee offered at public sale, and sold Shark river on the coast, and Lake Hopatcong (Brookland pond), Culver's pond and Quick's pond, all in Sussex county. In May, 1881, Mr. Force was elected register in the place of J. Lawrence Boggs, and John Kean, Jr., was elected treasurer. John W. Russell resigned as a member of the executive committee, and made a written offer to prosecute on behalf of the proprietors the recovery of lands mainly under water, in the neighborhood of New York harbor near Sandy Hook. His offer was accepted, and the contract under which he was to make the prosecution was approved by the executive committee, of which Mr. Force was a member. That prosecution was undoubtedly undertaken on behalf of himself, Mr. Force and Professor Cook, and the president, Force, Professor Cook, Surveyor-General Howell and Mr. Noble were appointed a committee to frame the contract with Russell and to employ counsel to assist them therein.

In 1881 the surveyor-general was authorized to cause surveys of all lands about Ocean Beach, Monmouth county, and in May, 1882, the council directed that notice should be published in the newspapers of the intention of the proprietors to survey all their lands. At that time Mr. Noble was elected president; Mr. Howell continued as surveyor-general and Mr. Force as register.

At that time Professor Cook, Mr. Howell and Mr. Force, as a committee, made a written report on ancient patents, and, in addition, Professor Cook made an oral report, in which he stated, according to the minutes, that the famous Coxe patent had never been granted, and that the council of proprietors owned the lands covered by it, and he (Professor Cook) and Mr. Force were made a committee with power to make settlement with all claimants of lands under those patents. The written report dealt with several patents or locations on the beach lands, com-

mencing with the Coxe patent at Little Egg Harbor, dealing with that, and the Sonmans, the Barker, the Burnett and the Gordon patents.

It will be seen hereafter that all these matters have an important bearing on the issues to be determined.

In May, 1883, Professor Cook was appointed surveyor-general and became one of the executive committee.

In the meantime Mr. Force, Professor Cook and Mr. Russell had purchased about nineteen hundred acres of warrants of location, and expended a large portion of them in a "survey" and "return" of lands on Sandy Hook, which they claimed had never been surveyed and sold to the government, but they failed to have their title recognized by the government, and their investment was nearly or quite a total loss.

We now approach the matters in controversy between the parties. The evidence, oral and documentary, shows that at this time Professor Cook and Mr. Force had acquired the confidence of the council of proprietors, and had induced them to believe that they could obtain for them and for their benefit valuable lands from three or four sources: *First*, lands along the coast which had never been located; *second*, lands in that neighborhood that had been located under invalid locations, like that of Coxe, Gordon and others; *third*, unenclosed lands in Morris and Sussex counties, which had been located under West Jersey warrants east of the Lawrence line; and *fourth*, lands that had never been located in Morris and Sussex counties; and the council had gone to considerable expense, at the suggestion of those gentlemen, in making maps and surveys by way of hunting for and locating these lands, particularly those in Morris and Sussex counties. The whole work was put in charge of Professor Cook, as surveyor-general, and he was authorized to expend what moneys were necessary for that purpose.

The proprietors were then possessed of a considerable fund, the result of previous sales of lands and lakes.

It is clear that at this time the proprietors claimed that all lands covered by water, whether fresh or salt, including the fresh-water lakes of northern New Jersey, belonging to them,

were not subject to location under general warrants in favor of private persons, but had been put in the hands of the executive committee to be sold by them for the benefit of the proprietors.

Some time, not later than the early part of the month of April, 1883, a Mr. Grinnell Burt, who was an officer, or in some way interested in the management of the Lehigh and Hudson railway (running from the Delaware at Belvidere, northeasterly, up the valley of the Pequest, across the divide between the Pequest and Wallkill, thence down the Wallkill to the Hudson), applied to Mr. Noble, who was then president of the council and *ex officio* member of the executive committee, to purchase from the council a small lake called Lane's pond, but afterwards known as Grinnell lake, situate by the side of his railway in Sussex county. Mr. Noble directed him to have a survey made and to hand it to him (Noble). Mr. Burt employed George M. Ryerson, of Newton, a deputy surveyor, to make the necessary certificate of survey and map. This Mr. Ryerson did, and Mr. Burt handed it to Mr. Noble. It is possible, though judging from Mr. Ryerson's method not probable, that this original descriptive survey was not in a proper shape to be certified to by the deputy surveyor and sent to the surveyor-general, but it seems to be sufficiently certain that it contained the metes and bounds of the unappropriated lands lying under the lake, and a proper map. The actual survey on the ground, if any, was made on the 27th of April. Just previous to a meeting of the executive committee held on the 8th of May, Mr. Noble presented it to Professor Cook and Mr. Force, informing them that Mr. Burt wished to purchase that lake, and Mr. Force presented it to the executive committee. Some discussion arose upon it, whereupon Mr. Amos Clark, one of the committee, proposed that they should sell it for $1,000. So far for the oral evidence.

Among the papers in the handwriting of Mr. Force, found by the officers of the proprietors after his retirement from the office of register, were the rough minutes of that meeting of the 8th of May, 1883. The part of it relating to the survey of Lake Grinnell is as follows:

"Survey presented by the president, Mr. Noble, of Lane's pond. Mr. Lord moved that we sell Lane's pond for one thousand dollars upon the filing of a proper survey. Approved."

The council of proprietors met seven days later, on the 15th, its regular spring meeting (when Professor Cook was elected surveyor-general), and the proceedings of the executive committee of May 8th, as reported and entered by Mr. Force with regard to this pond, are as follows:

"Mr. Noble presented a memorandum of lands covered by what is called Lane's pond, in Sussex county, and supposed to be unlocated. On motion of Mr. Lord, this was left for further information, to be obtained from the president, of location, value, &c., *in the proprietors' interest.*"

It thus appears that the original minute made by Mr. Force, at or about the 8th of May, was not reported, but the minute which was reported to the proprietors in council, and which was approved by council, clearly indicated that the executive committee and the council understood that this lake was to be dealt with by the committee as the property of the proprietors, and not subject to location under private rights.

About that time one McCoy, an old surveyor of Sussex county, but not a deputy, cast about him with a view of getting control of, by location under general warrants, several lakes in Sussex county, including Lane's pond. His experience as a surveyor and notes of his field work enabled him, by plotting, to ascertain just which ones had and had not been located, and he had discovered that Lane's pond had not been located. He took into his counsel one William S. Vanderhoff, an insurance and real estate broker, and Mr. Howard Little, who was a real estate dealer, and they concluded to take in with them one Stanton, the publisher of a newspaper in the neighborhood where they all lived, namely, Deckertown, in Sussex county. Mr. McCoy had a survey and map of Lane's pond, much like that made by Mr. Ryerson, the result of merely plotting other well-known tracts together and showing the vacancy. In point of fact, this had been the method adopted for years by deputy surveyors of making what were supposed to be, in theory, actual surveys; they pieced out neighboring surveys and demonstrated, by what may

be called the exclusive process, the existence of the vacant land, and made a certificate of a survey of it to the surveyor-general without ever having gone on the land.

These four gentlemen then began to cast about for rights of location, which, at this time, had become scarce as the result of the previous purchases made by Mr. Force before mentioned; and Mr. Little, who had previous acquaintance and some business transactions with Mr. Force, suggested that they apply to him; whereupon he, Little, did apply to Mr. Force some time just about the date of the meeting of the executive committee of May 8th, 1883. The result of that application was that Mr. Force agreed to join in the enterprise, and Mr. William Roome, living at Pequannock, in Morris county, an experienced surveyor, but not a deputy, who had been previously employed by the council in field work, and whose father, Benjamin Roome, then at an advanced age, had been a deputy surveyor for forty years, was employed to procure the necessary certificate of survey. Under date of the 27th of June, 1883, Mr. Benjamin Roome sent to the office at Perth Amboy a formal certificate of a survey of Lake Grinnell, purporting to include thirty-nine acres and three-hundredths of an acre. The survey of Mr. Ryerson contained thirty-six acres and seventy-one-hundredths of an acre. They do not, however, coincide in their boundaries, and each include several acres not included in the other. Both of these surveys purport, in whole or in part, to be the result of an actual survey on the ground. Only that of Ryerson was, so far as appears, the result of actual survey, and that only partial, by Mr. Caldwell, an employe of Burt. Mr. Roome's survey was made up from McCoy's plotting. But the indications are that Ryerson's original survey and map, which were before the executive committee on the 8th of May, 1883, were handed to Professor Cook and by him sent to Ryerson, resulting in a formal certificate of survey made by Ryerson as deputy surveyor, which is addressed by him to George H. Cook, surveyor-general of East New Jersey, and commences in the usual form, "I have surveyed for the council of proprietors of East New Jersey, at the request of Grinnell Burt, all that tract of unappropriated land," &c., and ends in this way:

"Bounded on all sides by prior locations, and the adjoining owners are aware that it is about to be located. A map of which survey and computation of its contents are herewith delivered to you. Survey made the 27th day of April, 1883. Chain-bearers were Andrew H. Konkle and Chas. Caldwell. Survey sent to surveyor-general September 3d, 1883. George M. Ryerson, Deputy Surveyor of East New Jersey."

The date "3" is erased and "14" written over it in different handwriting. That paper is endorsed by William M. Force, register, as filed September 14th, 1883, and also in the handwriting of Professor Cook, "September 14, 1883, George H. Cook, surveyor-general." A map and computation were annexed to it, of which we have a copy, but not the original.

The formal survey made by Mr. Roome was filed on the 27th of June, 1883, by William M. Force, register.

The correspondence between Professor Cook and Mr. Force indicates that Professor Cook, who was elected surveyor-general at the May meeting of the council, sent the Ryerson survey back to him to be put in proper shape and certified (but I doubt if it needed any correction in that respect), and that Mr. Ryerson, owing to illness, was unable to perform that duty until September. In the meantime the McCoy party got their survey recognized by Mr. Force, as deputy surveyor-general. The correspondence indicates that Professor Cook was not aware that Mr. Force was interested in engineering the successful survey.

Force entered into the agreement with McCoy and his associates to locate the lake on rights of location to be furnished by him (Force), and Mr. McCoy was to be paid for his services. Mr. Force was to be allowed for the rights of location, the property was to be put upon the market, and the profits equally divided. In pursuance of that arrangement Mr. Force prepared a formal "return," corresponding with the formal "survey" of Roome. By that return he certified, as deputy surveyor-general, that Roome had surveyed for John J. Stanton the lake by metes and bounds, containing thirty-nine acres and three-hundredths,

"to which tract and land and waters the said John J. Stanton hath right in part of a deed to him from Henry H. Yard, for 40 acres, as recorded in A. B. 12, p. 59."

Yard obtained his warrants from the heirs of Joseph E. Edsall, whose warrants were issued under the fourteenth dividend of 1856.

Professor Cook wrote to Mr. Force, under date of June 28th, in answer to a previous inquiry by Force, to the effect "that he should not wish to locate his warrants while surveyor-general," and preferred selling them to some one who would locate them and give him half the proceeds, or he was willing to sell them outright. This letter probably furnishes the explanation of the fact that the warrants were not taken from Professor Cook's account. How Force settled with Yard does not appear. Stanton conveyed one-fifth to Little, one-fifth to McCoy, one-fifth to Vanderhoff and one-fifth to Force. Afterwards these persons, directly or indirectly, conveyed the whole to Force. Force bought an additional strip of land by the side of the lake of one Kongleton for $150, and then conveyed to the Knickerbocker Ice Company for $3,000 the small piece of land he had bought of Kongleton, and the perpetual right to cut and harvest and remove ice from the waters of Lake Grinnell, as such waters were conveyed to him by Stanton and others. This $3,000 he received in cash, and he subsequently conveyed the fee of the lake to Grinnell Burt for a named consideration of $500.

It is alleged by the defence, and I assume it to be proven, that nothing was paid in cash by Burt, but it appears that he complained to Little and Force that he had been defeated in his straightforward attempt to purchase the lake in the usual way from the proprietors, and it was prudent to placate him; and further, in order to make the sale of the ice right to the Knickerbocker Ice Company, it was necessary to obtain through Mr. Burt a favorable freight rate for ice from that point to Philadelphia by Mr. Burt's railway. Mr. Force was obliged to pay divers sums of money to his associates, so that only a part of the $3,000 was profit.

The complainants claim both sums, viz., $500 expressed as the consideration in the deed and $3,000 received from the ice company.

The complainants rely—*first,* upon the right of the proprietors to hold this lake free from the liability to be located under out-

standing warrants; and *second,* upon the position of the defend-
ant, Force, as a member of the executive committee, charged
with the duties accepted by him of selling these lakes on account
and for the benefit of the proprietors; so that whether the rules
and regulations of the proprietors, which prevented the location
of these lakes under general warrants were valid or not, yet that
the relations of Mr. Force to the proprietors were such that it
was not competent for him for his own benefit to locate, under
any outstanding warrants, these lands, as against the proprie-
tors.   They also rely upon the fact that the actual return was
signed by him as deputy surveyor-general, without any proper
authority from the surveyor-general, and that the survey and
return were never approved by the council of proprietors.

The defendants put themselves upon the ground that Mr.
Force was regularly appointed deputy surveyor-general; that an
approval of the council of proprietors was not necessary, and
that the right of Joseph E. Edsall, under his warrant, trans-
ferred to Yard, and by him to Stanton, was a vested right which
could not be taken away by any action of the proprietors, by way
of resolution or otherwise.

The defendants further claim that the last (fourteenth) divi-
dend, under which these forty acres of rights of location which
were expended in this lake had their origin, was unrestricted in
its terms, and therein different from the previous dividends, and
that any subsequent limitations put upon it were ineffectual, and
if effectual, were removed by the seventh rule, adopted in 1879,
previously quoted.

This leads me to state, what I omitted in its proper connec-
tion, that in making the eighth dividend, in 1813, the council
resolved as follows:

"That all surveys to be made in right of above dividend to be subject
to the following rules and orders :   *   *   *   5th. That no long or narrow
surveys be made including meadows or swamps, *or any other survey what-
ever comprehending water,* rivers, brooks or creeks, without including a
proper quantity of land on each or either side thereof, unless there shall
be a particular order from the proprietors for the purpose."

A like restriction had been placed on the seventh dividend,
made in 1809.   The ninth, 1818; the tenth, 1823; the eleventh,

1828; the twelfth, 1834, and thirteenth, 1838, were all declared to be made subject to the same rules and regulations. The fourteenth dividend, May 20th, 1856, seems to have been made with very little formality, on the recommendation of the surveyor-general, Mr. Brinley, who was also register, and who recorded it thus:

"Whereupon it was agreed by the board that such dividend be declared, and the president appointed Messrs. William Paterson, Watson and Blauvelt a committee to examine the status of claims when the board adjourned."

It is worthy of note here that no meeting of the council between that time and 1859 seems to have taken place. It was usual for the minutes of the previous meeting to be read over in the presence of the next meeting, and, when approved by them, to be signed by the president, whoever he might be, of the approving meeting, and in the case in hand this took place in 1859.

It is argued by the counsel of defendants, in the first place, that the language of the restrictions of 1813 is not broad enough to cover a fresh-water lake. In this I cannot agree with them. I think it is, on its face, broad enough, and was intended to cover fresh-water lakes, and the subsequent conduct of the council in that regard is proof of the understanding that the council had of it.

It is further argued that the failure to place any restrictions on the fourteenth dividend gave the holders of warrants under that dividend a vested right to locate their warrants on any property of the proprietors, and that it was not competent for the proprietors to interfere with that vested right by any subsequent resolution or action.

In answer to that position it was argued by the complainants that the holder of a warrant of location had no vested right in any particular land until he had actually made his survey and secured his return, and that it was always in the power of the proprietors, at any time before a particular piece of land had been appropriated, and after a reasonable time for that purpose had elapsed, to withdraw it from the right of location, and this was argued to be *res adjudicata* in this state, as evidenced by an entry on the minutes of the council of proprietors, in 1769, in

the case of Lord Drummond (Earl of Perth), who applied to
the supreme court for a *mandamus* to compel the surveyor-gen-
eral to approve a return and survey which he had had made of a
large tract of land, in which the supreme court declined to grant
the *mandamus,* on the ground "that the council of proprietors
had the power at any time to vacate warrants before returns were
made thereon," and that the power to vacate warrants included
the power to restrict their location.    It was further urged that
warrants of location more than twenty years old should be con-
sidered as barred.

With regard to the lack of any formal approval of this survey
by the council it was argued by the defendants that it was not
necessary, and resort was had to a thorough examination of the
records of the council to show that it had not been the practice
in all cases to have such returns approved, but only in cases of
caveats or other special cases.

In answer to that, counsel for complainants referred to the
decided cases which tend to show that in all cases such approval
must in theory be had, and relied for that position upon what
was said by Chief-Justice Kirkpatrick in *Arnold* v. *Mundy, 6 N.
J. Law* (*1 Halst.*) *11, 68, 69,* and by Justice Washington in *Den*
v. *Sharp, 4 Wash. C. C. 609,* where, speaking of a survey and
return (at *p. 615*) he says: "This was to be effected by warrant
and survey duly made and returned, *approved by the council of
proprietors* and recorded."    And again (at *p. 618*), where he
says: "It is admitted on all hands that the survey passes no
title whatever *unless it be approved by the council of proprietors*
in order to be recorded, but when this is done we have the
authority of the late Chief-Justice Kirkpatrick in saying that
the title relates back to the survey."    Examination of the argu-
ments of counsel in that case, as reported by Judge Washington,
shows that he was right in his statement of the admissions of
counsel, and those counsel were L. Q. C. Elmer, Garret D. Wall,
L. H. Stockton, Richard Stockton and William N. Jeffers.    And
here the language of the third section of the act of 1787, before
referred to, is significant: "Any survey made of any lands
*    *    *    and inspected and *approved of* by the general proprie-

tors or council of proprietors, * * * and by their order or direction entered on record," &c.

And further, counsel here argued that where it has been held that it was not necessary to show affirmatively that the survey had been approved by the council, it was put on the ground that it must be presumed that it had been so approved in the regular course of business, and that the proprietors were estopped, in favor of innocent grantees and purchasers, from setting up that a survey and return which had been made and certified by the surveyor-general and duly recorded had not been approved by the council. See per Justice Bradley, in *Baeder* v. *Jennings, 40 Fed. Rep. 203, 204.*

This position, I think, is well taken, and that while most of the surveys have not been formally approved, yet that their validity, in the hands of *bona fide* purchasers and parties other than one of the officers of the council, depends upon the doctrine just stated, and that as between the council and its own officer—surveyor-general or register—the rule that the approval of the council is necessary applies, and that if the survey and return be such that it is manifest that the council would not have approved them, and such that the officer in whose favor they were made could not have compelled the council by legal proceedings to approve them, the return, so far as regards that officer, cannot be held to be valid.

Both parties relied on the practice of the surveyor-general and the action of the council in former years.

Complainant claimed that no survey of land under a pond, by itself, had ever been made without the express consent of the council, and pointed to instances where such surveys had been refused a return, and also to the fact that the council had claimed and exercised the exclusive right to sell these ponds. On the other hand, the defendants pointed to three instances in which the surveyor-general had returned warrants upon such ponds. The first is one by Francis W. Brinley, surveyor-general, to himself, of Hall's pond, in Sussex county, October 30th, 1854; another by Francis W. Brinley, surveyor-general, to himself, of Struble's pond, dated the 7th of May, 1855, and the third is one of Francis W. Brinley, surveyor-general, to Andrew B. Cobb, of

a portion of Green pond, in Morris county, dated 11th of August, 1856. It is to be observed of the first two of these surveys that Brinley united in himself the offices of surveyor-general and register; that they both purport to include land as well as water, and whether they do or not, it is to be observed that, so far as appears, they may have been made clandestinely and without the consent of the proprietors. Whether or not they would have stood the test of criticism by the council does not appear. The same may be said of the third, made to Mr. Andrew B. Cobb, who was a large individual proprietor. I am unable to see how these instances can be held to establish a general waiver by the proprietors of the right they claim in the premises. And with regard to the minute of the fourteenth dividend entered by Mr. Brinley, and the practice of that gentleman as surveyor-general and register, we find in Mr. Force's letters serious charges against him of dishonest practices whereby he had fraudulently obtained large tracts of land belonging to the proprietors and applied their proceeds to his own use, making use of his offices for that purpose. So that it hardly lies in Mr. Force's mouth to cite that gentleman's action as a precedent.

With regard to the right of Mr. Force to act as deputy surveyor-general, which was challenged, I find in point of fact that there was probably some sort of deputation made by Professor Cook to him, and that it was probably in writing, but the character and form of it does not appear. Nor does it appear, as I think it ought to appear, that such deputation was ever approved by the council. I come to the conclusion that so important a matter as the appointment of a deputy surveyor-general ought not to have been made without the express approval of the council.

But here again, if the return had been made by a person assuming to act without authority as deputy surveyor-general in favor of a third and innocent party holding valid warrants of location, I should think that, in favor of such a third innocent party, the title would have passed, and I think here that inasmuch as the title has finally passed to the Knickerbocker Ice Company and Mr. Grinnell Burt, who, so far as appears, paid for it in good faith, relying on the return and survey, the title

did pass as against the proprietors, and indeed the complainants' case, so far as Grinnell lake is concerned, rests upon that basis. Hence the sole question is whether or not Mr. Force, in view of his relations to the board, had the right to assist McCoy, Little, Vanderhoff and Stanton in procuring this title in the manner that he did and to reap the personal benefit that he did from the transaction.

But before expressing the final result to which I have arrived on those questions, I will proceed to consider two or three other similar cases brought forward by complainants.

Mr. Force discovered that the surveys of Ryerson and Roome of Lake Grinnell each included some land that the other omitted, and about a year later procured Mr. A. P. Irons, a deputy surveyor, living at Toms River, to make a third certificate of survey from the plottings and surveys of Ryerson and Roome, already in hand, and the old adjoining surveys. By his "survey" Mr. Irons took in forty-seven acres and eight hundredths of an acre, and after deducting the survey to Stanton there remained eight acres and seven hundred and seventy thousandths of an acre. That certificate of survey is dated June 4th, 1884, and is addressed to George H. Cook, surveyor-general. It is marked "filed June 4th, 1884," by William M. Force, register. It purports to have been surveyed "for the council of proprietors of the eastern division of New Jersey." After those words there is interlined, in the handwriting of Mr. Force, these words: "At the request of William M. Force." The endorsement, in Mr. Force's handwriting, is in these words: "Survey of lands, township of Sparta, county of Sussex,. at the request of William M. Force," the words "of William M. Force" being written at a different time from the remainder of the words and over a pencil erasure. On that "survey" Mr. Force made a "return" to himself by virtue of warrants of location which he had purchased from Benjamin and William Roome, and which they had purchased from John Rutherford, formerly president of the council, and signed it "William M. Force, deputy surveyor-general." The original is not produced, and the foregoing is taken from a copy taken from the clerk's office in Sussex county, where the original appears to have been recorded.

The eight acres so returned to Mr. Force were included in and conveyed by the deed to Burt, and formed a part of the land so conveyed to him.

Just up stream from Lake Grinnell, and very near to it, is a small lake called Upper White pond. At the same time that Mr. Benjamin Roome certified to the survey of Lake Grinnell, to wit, June 27th, 1883, he also certified to a survey of Upper White, as it was called, and the chain bearers were James W. McCoy and William Roome. By this paper Mr. Roome certified that he "did survey for William S. Vanderhoff all that tract," &c., containing twenty-eight acres and forty-nine hundredths of an acre, strict measure. That survey was filed on the 27th of June, 1883, and at *some* time the words "William S. Vanderhoff" were erased, and "George H. Cook" written in their place, not in Mr. Roome's handwriting. The handwriting of Professor Cook does not appear upon it. Upon that "survey" Mr. Force, on the 15th of July, 1884, a little more than a year later, made a "return," reciting the survey by Roome for George H. Cook of the land as described, "containing twenty-eight forty-nine hundredths acres, to which said Cook hath rights by virtue of an assignment of rights of location from Matthew Perrine." These rights of location were derived from the twelfth dividend. The return is dated the 15th of July, 1884, signed by William M. Force, deputy surveyor-general, and it is endorsed in this wise in Mr. Force's handwriting: "Sussex County, Sparta Township, July 15th, 1884, Charles E. Noble, Trustee, and wife to George H. Cook, acres 29 49-100."

In order to understand the force of this language it is proper to observe that at the May meeting of 1884 the council had ordered a warrant of location for ten thousand acres to issue to Charles E. Noble, who was then president of the council, in trust for the proprietors. This was the same warrant which was under consideration in the case of *Jennings* v. *Burnham, 56 N. J. Law* (*27 Vr.*) *289.* That mode of making title to the lands, which the proprietors expected and hoped to sell, was adopted in accordance with the ancient precedents before referred to, instead of making an ordinary deed of conveyance under the hand of the president and seal of the council as had been the practice for

about ten years previously. That endorsement on the return indicates that at that time, July, 1884, Mr. Force either expected, or was willing, that any person seeing that paper should believe that the transaction was in the interest of the proprietors. And this is further evidenced by an unexecuted deed in Mr. Force's handwriting, which was found among the papers, dated the 15th of July, 1884, purporting to be made between Charles E. Noble, trustee of the board of proprietors of East New Jersey, and his wife, of the first part, and George H. Cook, of the second part, whereby in consideration of one dollar Mr. Noble conveys the lands described in Roome's survey of Upper White pond to Professor Cook.

The correspondence indicates, as already observed, that Force's interest in Grinnell was concealed from Professor Cook, and also that this certificate of survey of Upper White was not at first disclosed to him, for we find Force writing to him on October 9th, 1883,

"I do not encourage the parties to locate White lake under rights [of location], but I have recommended that they purchase, as I want to see funds coming in to pay expenses."

Just when Professor Cook did become acquainted with these facts does not appear, but we find that on the 17th of May, 1887, he conveyed to Mr. Burt Upper White pond in consideration of $900.

And it is proper just here to remark that the Matthew Perrine rights upon which the Upper White pond was located are shown by a memorandum in Mr. Force's handwriting to have been purchased by Force in Cook's name, and paid for by Force.

Mr. Force received the cash from Mr. Burt for that conveyance, and August 2d, 1887, sent his check for one-half, $450, to Professor Cook, who received it. This indicates that the transaction was the result of the suggestion in Professor Cook's letter of June 28th, 1883.

The next matter brought in question is Dunker's pond, which was surveyed in 1886. That lake lies in the upper part of Passaic county, near the Sussex line, and its outlet is one of the tributaries of the Pequannock river. At or before 1886 a large

water company was engaged in buying up lands and water rights in that neighborhood, and their buying agent, Mr. Hoxie, applied to Mr. William Roome to purchase this Dunker's pond. Mr. Roome, from surveys and plottings to which he had access, was satisfied that it was mainly vacant land, and undertook to procure it for Mr. Hoxie. He was well aware of the instructions to deputy surveyors not to return ponds under general warrants, and swears that he supposed that the surveys he made at Upper White and Grinnell were made for the benefit of the council of proprietors. He had been employed by them for several years in field work in Ocean and Monmouth counties, was thoroughly familiar with their rules and regulations and with the ownership of the outstanding warrants of location. He and his father had sold some to Mr. Force at $5 an acre. He swears that he understood that none of these lakes could be taken up on private rights, and therefore applied immediately to Mr. Force, as register and member of the executive committee who had in charge the selling of lands on behalf of the proprietors, to purchase this lake. His first letter to Mr. Force is lost; he states the contents of it. In his letter was enclosed an informal survey and map of the lake. In answer to that he received a letter from Force, dated February 4th, 1886, acknowledging receipt of his letter and asking him to

"make the usual return [by which he means "survey"] and have your father sign it, and let it state that it was done at the request of William M. Force."

A week later he received another letter from Force with some suggestions with regard to the description and map to be annexed to his survey. On February    he wrote Force asking him to pass the Dunker pond survey as already prepared, and said if so, he thought he could sell it for him, as certain parties wanted to buy. On the 2d of March Force wrote to him that he would try and get the survey approved, and that he asked $500 for it; there was a growing craze for the ponds, and he had just had a survey made of Little Swartswood, for which he was asking $2,500, and that Decker's pond, previously sold to Mrs. Truesdell, was now priced at $5,000. A day later, March 3d, he writes

to Roome that Professor Cook had approved the survey with some corrections. Finally it was agreed that the price should be $500. Then, on March 13th, Force writes to Roome a letter in which he uses this language: "If you will give me the name of the purchaser I will have the name put in the deed and *have the president sign it* and close the sale." That was, in effect, a statement to Roome that the sale was on behalf of the proprietors. The survey was approved by Professor Cook in his own handwriting, and filed February 12th, 1886, and was dated on that day. Under the same date Mr. Force, as deputy surveyor-general, made a return of it to Professor Cook under warrants of location, which Mr. Cook had derived from the heirs of Thomas B. Stout, and which, by the memorandum before referred to, were paid for by Mr. Force. Professor Cook then conveyed Dunker's pond to Senator Hobart, for which Mr. Force received $500; paid $10 to Mr. Roome for his services, and sent his check to Professor Cook for $245, on the 1st of April, 1886. The Stout warrants of location were derived from the ninth, tenth, eleventh, twelfth, thirteenth and fourteenth dividends, all merged.

The correspondence between Professor Cook and Mr. Force of this date, and the acceptance by Professor Cook of the one-half of the proceeds of Dunker's pond, shows that the scruples he had professed to feel in June, 1883, as to locating his own warrants while surveyor-general, had been removed.

It is proper to remark that there are two formal returns of this survey wholly in Mr. Force's handwriting, one dated the 12th of February, 1886, purporting to be signed by George H. Cook, surveyor-general; the other dated the same day, signed William M. Force, deputy surveyor-general. In this last the date "12th of February" has been written over the words "March 25th;" both of these are endorsed by Force as deputy surveyor-general, and one was originally recorded in Book S 21 of Surveys, page 198, as certified on the back, and that certificate altered to S 23, page 295; and the other is certified on the back to be recorded in S 23, page 295. They are actually recorded in two places; one in S 23, page 198, which record is not signed by

the surveyor-general; the other is in S 21, page 295, and is signed by Mr. Force as deputy surveyor-general.

Two other lakes were located by Mr. Force and Professor Cook, namely, Struble lake, which is also situate adjoining the Lehigh and Hudson Railway Company, the title to which was taken by Mr. Force, not parted with, and Little Swartswood lake, the title to which apparently rested in Professor Cook at the time of his death, and one undivided half of it was conveyed after his death by his widow and devisee to Mr. Force. The prayer of the bill is that these titles may be declared to be held for the benefit of the proprietors.

With regard to Struble lake: A large amount of evidence was introduced showing that it was taken up by Mr. Force under the same circumstances as that of the other lakes just dealt with, and, on the part of the defence, that, in point of fact, Mr. Force got no title from the proprietors, but that the whole lake was covered by previous surveys—mainly Brinley's, above referred to—which he was obliged to buy in; and the counsel for defendants offered to reconvey to the proprietors whatever rights Mr. Force actually got from the proprietors in that lake.

I have fully examined and considered the evidence with regard to this lake, but the fact that there is little in it to dispute about leads me to omit to state it, or give my conclusions thereon.

With regard to Little Swartswood: That is a small lake lying just to the east of the Lawrence line, and nearly adjoining the Great Swartswood, which lies to the west of that line. About 1882 or 1883 the proprietors, as we have seen, at the instance and upon the advice of Professor Cook, concurred in by Mr. Force, undertook the enterprise of ascertaining and locating all the lands in Morris and Sussex counties held under West Jersey patents east of the Lawrence line, and also hunting for lands that had never been located under either of the councils of proprietors, and a large expense was incurred in that line of examination. A young lad who was about to graduate from Rutgers Scientific School, named Blakeley, was employed by Professor Cook to do this work, the principal part of which was done in the office at Perth Amboy, by way of mapping surveys there

recorded, or at Burlington, and piecing them together, but some of the work was done on the ground.  In February, 1886, he was at work in Hardyston township, Sussex county, and went to Swartswood lake to locate there with accuracy the Lawrence line, which he had discovered, by inspection of the old map of it previously referred to, had a jog in it at that point.  He did survey in the neighborhood, and also at the same time surveyed Little Swartswood by running the lines of the lake on the ice, including no land whatever.  That this occurred in the month of February is made certain by Force's letter to Roome, dated March 2d of that year.  Blakeley swears that he made the formal certificate of survey, or, as it is called, the "survey," about the 8th of April.  Be that as it may, that formal certificate is dated Perth Amboy, May 5th, 1886, and is endorsed in Professor Cook's handwriting, "Received May 18th, 1886, and approved." It contains eighty-six acres and sixty-nine hundredths of an acre.  When produced a computation was annexed to it, but no map as the rules require.  A map was, however, found at the hearing and annexed to it.  (There was also found and produced by the defendants a map of Great Swartswood lake, including Little Swartswood lake and the surroundings, with the location of the Lawrence line.)  The return on that survey was made to Professor Cook, signed "George H. Cook, surveyor-general," but the whole, including the signatures, is in the handwriting of Mr. Force, and declares that it is made to Professor Cook by virtue of several warrants to him by the executors of John Stout, who were the executors of Thomas Stout, deceased, and those, as we have already seen, were purchased from the Stouts and taken in the name of Professor Cook with Mr. Force's money, and originated in the ninth, tenth, eleventh, twelfth, thirteenth and fourteenth dividends.  The rule of the office requires that when a return is made of a survey on the strength of any warrant, the number of acres shall be charged against the holder of that warrant in the book of warrants.  That is to say, a credit and debit account is kept of the warrants issued, to whom issued, and if assigned and conveyed, to whom assigned and conveyed, and the holder of the warrant is charged with all the surveys that are returned against it.  The "return" in this case, except its

date, does not show when it was filed. It is recorded in the Book of Surveys, S 21, page 309, without any date of its record, but is subsequent to a return which is dated the 11th of March, 1889; another the 7th of December, 1888; another the 14th of December, 1887, &c., and is the very last return recorded by Mr. Force before he was superseded in office in May, 1890. The number of acres is charged in Warrant Book 11, page 99, against Charles E. Noble, trustee of the council of proprietors of East Jersey, for the ten thousand acres issued to him on the 20th of May, 1884. The words of the charge are these: "May 18th, 1886, S 21, 309; 86 69-100 rights of location." This is the last charge made against the Noble ten-thousand-acre warrant. There are twenty-four previous charges, and in each case the date of the return, the book and page where recorded, the number of acres and the person to whom sold, are given. In the charge of May 18th, 1886, the name of the person to whom the land was sold is not given, but in the place where that name should be is found the words, "rights of location." While the entry is dated May 18th, 1886, it follows ten entries of a later date. Besides this charge of the acres in this survey against Mr. Noble, there is a like charge against Professor Cook on page 96 of the warrant book. The entry there is: "86 63, George H. Cook," and before it, in pencil, "Little Swartswood," all in Mr. Force's handwriting, but without date, and no reference to the place of record in the book of surveys.

The significance of these dates is that while the "survey" of the lake was undoubtedly made before the time it bears date, and was filed and examined by Professor Cook at that date (May, 1886), the "return" was held back for some reason until some time, not earlier than the summer of 1889, as Professor Cook died in September of that year. The fact that the entire document, including the signature, is in the handwriting of Mr. Force, indicates that it was never seen by Professor Cook. His widow treated the title as having vested in Professor Cook in his lifetime, and on November 20th, 1889, shortly after his death, she conveyed an equal undivided one-half part of it to Force.

It is alleged by the complainants that this survey on the ground, and all the work in connection with this lake, was done by Mr. Blakeley, while in the employ of the complainants, and at their expense.   Some ten or fifteen different bills for services were rendered by Mr. Blakeley, extending over the time from 1884 to 1888, and some of them are duplicated.   The latter part of the time of his employment, at the request of Mr. Force, he attempted to segregate these charges, and to distribute them over different points of work and different subjects, and the result of that effort is found in the book called "Book of Surveys and Expenses," all in Mr. Blakeley's handwriting, and a copy of which is also found in the manuscript in Mr. Force's handwriting.   On that book, under the head of "Miscellaneous Accounts," are these entries: "1886, February 10th-12th, one day at tracing Lawrence line at Swartswood, expenses and board, $4.50;" then "April 13th, 1887, one day making map of Swartswood lake, $3.00;" then "April 14th-15th, making copies of certificate, $6.00."   Mr. Blakeley on the stand, in the first place, swore very clearly and distinctly that all the work he did was included in his bills and charged to the proprietors.   The bills are all made out in that way.   But when his attention was called particularly to this item of Little Swartswood, he swore that the charges just recited referred to his work in locating the Lawrence line at that point, and the map he made to illustrate it, and that by an arrangement between him and Professor Cook he was to charge the professor with the work of surveying Little Swartswood, and that he did so, and that Professor Cook paid him for it.

In that connection it is proper to remark that the defendants had free access to all of Professor Cook's papers, and spent some time in going through them, and that they have spared no pains or labor in preparing their defence, and that no bill from Blakeley to Professor Cook for this work was produced.   The inference that I draw from the evidence on the subject is this:   That Mr. Blakeley obtained this long job from Professor Cook, and received many hundreds of dollars from the proprietors for his services, besides all his expenses, and that if Professor Cook asked him to do the simple work which he did, namely, run around the edge of Swartswood lake with chain and compass on

the ice and make a certificate of survey as deputy surveyor, he would probably do it without charge to the professor. But there is one item in the account which seems inconsistent with even that theory. I have remarked that the certificate of survey made by Mr. Blakeley had no map annexed to it when produced, but that a map was produced afterwards which was made on tracing cloth, colored and tinted, showing the outlines of the pond, with topographical marks upon it and the lines of the survey running around the edge of the water, evidently the result of considerable labor. Now, the charges of "April 13th, one day making map of Swartswood, and 14th and 15th, *two days making copy for certificate,*" altogether $9, would seem to apply to the map annexed to the survey, which is undoubtedly a copy on tracing cloth from another map made on ordinary drawing paper, and the language used, "copy for certificate," is significant. The fact is that the document made by the deputy surveyor, which we usually call a "survey," is, in point of fact, a certificate under his hand that he has surveyed so-and-so for so-and-so, and the proper name of it is "certificate," and the word "certificate" in the charge just referred to properly applies to such a document. This entry in the Book of Surveys and Expenses does not, however, correspond with the original in his bill, which is for "making copy of Coxe survey for U. S. Court."

But I think it was the intention of the parties originally, both Professor Cook and Mr. Force, that the expense of the survey of Little Swartswood should not be charged against the proprietors; and this is manifest from a clause in a letter written by Professor Cook to Mr. Force, dated May 8th, 1886, just about the time this transaction was *in fieri*—a letter of great importance in another part of the case not yet reached—as follows:

"Mr. Blakeley was here on Thursday. He brought his journal of daily work and his expenses by items. As a tentative effort we went over his account and marked it under three heads—*first,* work like that done at Swartswood to be put in a bill by itself, and I to see it settled."

However, if my inference be reliable that this work was done *gratis* for Professor Cook, the result is the same, as it was in effect paid for by the proprietors.

So much for the question as to whether the proprietors paid for this work. In other respects the case stands precisely like that of Dunker's pond and Grinnell and Upper White lakes, and we now come to the question as to the true solution of the rights of the parties in regard thereto, and I think that must be determined by considerations somewhat above and outside of the technical legal questions which were so elaborately discussed by counsel, and which I have already briefly stated.

The situation of the parties was this: The proprietors were the legal owners of all the unappropriated lands in East New Jersey. Their outstanding warrants of location were so many equitable charges against those lands, which, for present purposes, I shall concede that it may be doubtful at least whether the proprietors had the right to abridge or disturb by restricting their location. But be that as it may, the proprietors claimed openly, and their claim was well understood by Force and Cook, that they had the exclusive right to all of these lakes, and that they were not subject to being appropriated by ordinary outstanding warrants. The power of so appropriating them rested in the surveyor-general and the register, but more particularly, perhaps, in the surveyor-general, who was the officer who, by the long-settled practice of the proprietors, had the power to make a "survey," either in person or by a deputy, at the request of a warrant-holder, and then to make a "return" to him, thereby appropriating a certain portion of land to him in satisfaction of so much of his warrant. Without the action of the surveyor-general the warrant-holder was powerless. Now, at the time covering the transactions in regard to these lakes Professor Cook was the surveyor-general and Mr. Force was register, and, as he alleged, he was also deputy surveyor-general. Assuming that to be so, then the power of making these appropriations in the nature of partitions rested in their hands. They were also members of an executive committee of the council of proprietors, raised at their own instance, and they were by their own consent entrusted by the proprietors with the duty of making sales of all these lakes for the benefit of the proprietors, and they were, in effect, forbidden to make any returns of them on private warrants. That position was assumed by them voluntarily, and as

a result they, as trustees, owed a duty to the proprietors to act in the interest of their employers, and in my opinion it follows that it was not competent for them, while occupying that position, to make a survey and return on any lakes for their own benefit.   Such action was a clear breach of the trust imposed upon them, from which, it seems to me, they should not be permitted by a court of equity to take any benefit.

Further, I think the result is not changed, if we admit to its fullest extent the position taken by the counsel of the defendants in his very learned, able and ingenious argument, namely, that the holder of these warrants had an absolute right to have them located on these lands.

But the argument of defendants' counsel proceeds further, and asserts that Mr. Force, although he had notice that the proprietors disputed the right, still had the right to purchase these warrants and locate them, and to be subrogated to the rights of the original warrantees or grantees of the warrants, relying in support of that position upon the familiar doctrine that a person who has notice of an outstanding equity or defence may purchase from a person who has no notice and be subrogated to his rights.

But I think that doctrine does not apply here.   The position of Messrs. Cook and Force in this case, if stated in the aspect most favorable for them, was that of agents and trustees employed by their own consent to sell lands for the benefit of their employers, and who, holding powers of attorney to convey, yielded to a demand of a party having an adverse claim, and used their powers of attorney to convey to him, against the will, instructions and interest of their employers, and then, having vested title in the adverse claimant, repurchased the property from him.   Such a transaction, it seems to me, cannot be sustained upon any principle of equity.

If those gentlemen, or either of them, desired to recoupe the losses they had sustained in their unfortunate location of warrants on Sandy Hook by locating upon inland lakes of East New Jersey, they should have resigned their positions as members of the executive committee, and as surveyor-general and register, and should have declined to serve the proprietors in the way they did, and applied openly for the right to locate upon these lakes.

I think their official positions were incompatible with their claiming the right to locate these lands under warrants of location.

I ought, perhaps, sooner to have dealt with an objection taken by counsel for the defendants to this proceeding on the ground that there is here a defect of parties; that admitting that the council of proprietors, or the proprietors themselves, are a corpo · ration and competent to sue, yet that they are mere trustees for the legal holders of the title, and that in an action of this kind all the *cestui que trusts* should be made parties, or at least enough of them to represent them all.

The difficulty of that position is at once apparent, viz., that, as I understand the decision of the court of errors and appeals in this cause, the proprietors themselves do compose and form the corporation, each being a member of it, and that their corporate action is manifested by their meeting in council under the agreement of 1725, and that the individual holders of proprietary shares are no more proper or necessary parties to this suit than would be the individual stockholders in a corporation necessary parties to a suit brought by the corporation to vindicate their rights.   The distinction, however, drawn by the learned counsel was that here, by the well-settled law of the land, the title is vested not in the corporation, but in the individual members as tenants in common.   Granting that to be true, still the individual members do, in the aggregate, form a body corporate, and they are competent to sue in their corporate capacity and not as individuals, and the suit is brought not by one or two or three, but by all, in their collective capacity, and it is brought by all for the benefit of all.

The counsel did not press the point with much earnestness, so far as regards the recovery of moneys, because he admitted that money, if any is collected in this suit, must go directly to the proprietors and not to the individual members, but he urged that that consideration did not apply to the recovery of lands, because that belonged to the individual members.   But the decree asked for is that Force may be decreed to hold these lands in trust for the proprietors, and such decree will revest the title, if any passed, at law, in the proprietors as it stood before in their indi-

vidual capacity, and I am unable to see any incongruity in the proprietors in their corporate capacity coming to this court and asking it to decree that this title shall be vested in them individually as it stands by the strict letter of the law.

The principal object, however, of counsel in taking this objection was to prevent the evidence of any of the proprietors being legitimate as to conversations and transactions had with the deceased. But the answer first made, to wit, that the corporation is composed of all the proprietors, seems to me to meet that position, and that the argument, carried to its logical conclusion, goes so far as to hold that no person holding stock in a corporation could be a witness in a suit brought by the corporation against the representatives of a deceased party to prove transactions or conversations with such deceased party. But be that as it may, if the point be determined in the defendants' favor, the only result would be that the complainants would be obliged to bring in the individual holders of the proprietary shares as parties. They would not be obliged to make them parties complainant, but could make them parties defendant, and in that case, as I understand the statute, they would not be debarred from being witnesses. Moreover, I think it of not much importance in this case, as far as the lakes are concerned, because the evidence as to them is almost complete, without regard to any conversations with Mr. Force proven by any parties holding proprietary shares.

I now come to the more serious and difficult questions in the cause. I have referred to the situation of affairs in the spring of 1883, and to the attention which had been given by the council to the lands which it claimed along the coast, and which were about this time becoming valuable. These lands consisted principally of an island beach or tongue of land separated from the mainland by the waters of Barnegat bay, commencing at Little Egg Harbor inlet, the extreme southerly point of the domain of the East Jersey proprietors, and running north till it merges in the mainland at or near the southerly line of Monmouth county. About nineteen miles north of Little Egg Harbor inlet it is intersected by Barnegat inlet, and the island so cut off is called Long Beach, and averages a little over half a mile in width.

Not far from its southerly terminus the two lines of Keith and Lawrence cross each other and form a little gore south of the crossing, which we may call the third gore, covering a part of the extreme southerly point of Long Beach, which appears to be a recent formation. About one-half of the southerly end of Long Beach was covered by the famous Coxe patent, the northerly end of which reached, but did not include, what is now known as Long Beach City. This Coxe patent was partitioned in 1818 between the then owners under it into nineteen lots by lines running across the beach. North of the Coxe patent comes that of Peter Sonmans, dated May 24th, 1690, about a mile in length along the beach, including Long Beach City and the point of the crossing of the railway from the mainland. Next, north of the Sonmans' patent, comes a vacant space of about a mile and a quarter in length, which had never been located. Next, north of that, comes the patent of Gordon, son of Gordon of Cluny, dated May 24th, 1690, extending a distance of about three miles. Then came the patent of Thomas Hart, February 4th, 1692, which extended to Barnegat inlet. Outside of the lines of these patents were several pieces of land and islands, especially a group extending into Barnegat bay, south of Barnegat inlet, which do not appear to have been covered by any patent. North of Barnegat inlet is Island Beach, which was partly covered by a patent to James Alexander.

In 1882 Professor Cook, Mr. Force and Mr. Howell reported on these ancient patents or surveys, and condemned them as not valid, and Professor Cook and Mr. Force were appointed a committee with power to make settlement with any claimants or those in possession under these patents. In 1883 Professor Cook, as surveyor-general, made a report to the council as to the progress he had made in the review of the ancient grants, and illustrated it by maps and locations, and also referred to the encroachment made upon East Jersey lands by the West Jersey grants, which report was approved, and the surveyor-general authorized to continue his work. Generally, the surveyor-general was directed to proceed and have plottings, surveys and maps made of the whole of the domain of the East Jersey proprietors, with a view of ascertaining—*first,* lands that had never been

located; *second,* the encroachments on East Jersey under West Jersey patents, and *third,* the invalid locations along the beach. It is important to observe this classification, as it has a bearing on the questions to be considered.

Some time in the fall and winter of 1883 and 1884, Mr. A. P. Irons, a surveyor of Toms River, had negotiated between Messrs. Culver and Wright (who were the present owners of the land covered by the patent issued to Gordon, son of Dr. Gordon, of Cluny, on Long Beach) and the proprietors represented by Mr. Force as a member of the executive committee, for a confirmatory title from the proprietors, and had agreed upon the sum of $2,500 to be paid by Culver and Wright, of which he was to receive $500 for making negotiations and survey, and the proprietors were to receive $2,000. When he thought he had the matter ready to close Mr. Force told him that that survey could not be passed by the surveyor-general (Professor Cook) unless he received some pay, and suggested a contribution from Mr. Irons for that purpose, which he declined to give. Mr. Force then procured an interview with Messrs. Culver and Wright, or one of them, and induced them to advance their price to $2,600, and then, on the 8th of March, 1884, brought the matter before the executive committee, stating it as a sale to Culver and Wright for $2,600, of which $600 was to go to Mr. Irons for his services as surveyor, &c. The executive committee approved it, and their action was reported to the council of proprietors on the 20th of May, 1884, and was approved by the council, and a "survey" and "return" of the Gordon survey was made by Mr. Noble under his warrant of ten thousand acres, before mentioned, and a deed made by him to Culver and Wright, and they paid the whole sum of $2,600 to Mr. Force not later than the 28th of May, 1884. Whereupon Mr. Force wrote to Mr. John Kean, Jr., the then treasurer, under date of May 29th, 1884, as follows:

"Yesterday I came in the receipt of $2,600, check for lands sold by the proprietors on Long Beach. I have deposited the funds in the Second National Bank of Jersey City, as register. There is to be paid out of this to the deputy surveyor, for expenses of various kinds, as understood by the board, $600, and as I have the balance uninvested, submit whether

I might not better pay out of this fund the bills awaiting payment, instead of drawing upon your invested funds.   Your reply will oblige, Yours," &c.

It does not appear what reply, if any, Mr. Kean made to this letter.    At any rate, Mr. Force kept that money and all subsequent receipts, amounting in the aggregate to more than $19,000, for sales made of lands on the beaches just referred to.

On the 4th of June, 1884, he paid to Mr. Irons $500, and took from him a receipt for $600 "in full for *services rendered as a deputy surveyor* in the matter of the so-called Gordon patent on Long Beach, N. J.," as appears by Mr. Irons' receipt.

There can be no doubt from this and the other records that at this time the council were fully aware of the situation at Island Beach and Long Beach.    They knew what patents were laid upon them, that there were vacant lands there, and that there was good prospect for them to recover a large sum from it.    In fact, this sale to Culver and Wright was the first gathering of the profitable crop from that neighborhood promised by the report of the executive committee in 1880, before referred to.    At the same time Professor Cook was, at each meeting, showing them the great prospect there was of recovering unenclosed lands covered by West Jersey patents in Morris and Sussex counties, and also lands in those counties unlocated under either set of proprietors, and they were authorizing him to expend moneys in search of those lands and in testing the title thereto.    And it is quite apparent that there was a great distinction in the minds of the proprietors, and, in fact, between the lands on the beach, or beach land, as it was called, and those in Morris and Sussex counties, in respect to the knowledge of the proprietors as to the location of the two classes of lands and the probability of their being able to realize from them; and, with regard to the beach land, they had before them an object lesson in the case of the Gordon patent just sold for a substantial sum.

Among the resolutions of the executive committee reported to the council of proprietors at the May meeting of 1884 was one expressing appreciation of the work done by the surveyor-general in tracing up and mapping ancient locations by the earlier proprietors, and recommending that he continue the same as now

being done, and another appropriation of like amount as the previous one be made for that purpose, *and that the surveyor-general and register proceed to investigate locations made upon lands of the East Jersey proprietors by West Jersey grants with a view of maintaining the rights of the council.* This was approved by the council.  ·

In the October meeting of 1884 of the council the surveyor-general made a verbal statement as to lands held under West Jersey titles, and explained the surveys he had ordered made and the maps and mode of identifying each item, and the contents of the same, without further cost of survey.

In the minutes of the same meeting, October, 1884, is this entry in Mr. Force's handwriting:

"The register called the attention of the board [council] to the lands held under the pretended patent to Daniel Coxe, and of the unlocated lands along the beach and elsewhere, and also those held under West Jersey surveys east of the Lawrence line; that the settlement of these matters after so long a delay would involve large expense, and suggested that not less than sixty per cent. would compensate for *the amount of clerical labor in searches and in recovering the rights of the East Jersey proprietors therein.*"

And then, on motion of Mr. Russell, that suggestion of the register was referred to the executive committee, giving full power to them to take action in the premises.

In this statement of Mr. Force it will be observed that he divides the landed property from which an income to the proprietors is expected into three distinct classes—*first,* the lands held under the Coxe patent; *second,* unlocated lands along the beach and otherwise, and *third,* those held under West Jersey surveys east of the Lawrence line. Then the matters to be compensated for by the sixty per cent. are—*first, clerical labor in searches,* and *second,* in *recovering the rights* of the East Jersey proprietors therein.

At the next meeting of the council, held May 19th, 1885, Mr. Howard Little, previously mentioned in connection with Lake Grinnell, took a seat in the council by virtue of a quarter share of "propriety" that, as appeared in the evidence, he held as trustee for Mr. Force. And at that meeting what purported to be the

minutes of the proceedings of the executive committee of October 31st, November 10th, November 20th and December 4th, 1884, and May 13th, 1885, were read and approved by vote, except the minutes of December 4th, whose acceptance was objected to by Mr. Kean, and, on motion of Mr. Clark, the same were laid on the table; and at the same meeting Professor Cook, as surveyor-general, made a report relating to the progress that the board was making toward the recovery of lands previously appropriated by the West Jersey proprietors, and surveys that had been made and returned upon the beach at Little Egg Harbor, Shrewsbury river, &c., as directed by the executive committee, and the further work and progress toward completing the recovery of the lands to which the proprietors are entitled.

The minute of the executive committee, which was objected to and laid over, was in these words, as recorded by Mr. Force:

'WHEREAS, At the last meeting of the board [council] this committee were empowered by resolution to arrange for the early survey and location of unlocated lands east of the line of partition under a proposition or suggestion made by the register, and the same having been fully considered since the meeting of the board,

"*Resolved,* Upon motion of Mr. Watson, that the register proceed to have the records examined with a view to the locating and making sale of all unlocated lands, under the authority and return of the surveyor-general, beginning at Little Egg Harbor and running northerly, and that the register shall be entitled to compensation for such service to sixty per cent. of the lands so located, or sixty per cent. of the proceeds of sales thereof, with an allowance for surveyor's fees that shall not exceed twenty per cent. of the sum he may expend therefor on all sales made."

The action of the council thereon was as follows:

"Mr. Rutherford moved the acceptance of the minutes as just read. Mr. Clark called the yeas and nays. Upon call the yeas were Messrs. Lord, Cook, Rutherford, Little, Watson, Force—6. The nays were Messrs. Kinney, Kean, Clark, DeBow, B. F. Howell, B. F. Howell, Jr., Willis K. Howell—7.

"The acceptance of the report of the executive committee was not agreed to."

Now, it will be observed that of the six voting in the affirmative, Professor Cook, Mr. Force and his figurehead, Mr. Little, were three. It appears from the minutes that the discussion

upon this resolution of December 4th was continued in the afternoon, when the council adjourned until the 3d of June, 1885.

After the adjournment, and before the minutes of the meeting of June 3d, is entered this minute of a meeting of the executive committee, held six days previously, May 13th, 1885, follows:

"The surveyor-general submitted for examination the maps he had had prepared showing the encroachment of West Jersey and the lands held under titles of the West Jersey proprietors in the county of Morris only, amounting to about 130,000 acres, for which the East Jersey proprietors have had no compensation. Most of this has been lost by the effect of the statute of limitations, but vigilance may restore portions of it. The executive committee would therefore recommend that all such encroachments as made in Morris county [*sic*] that maps be also made for Sussex county and Passaic, upon lands lying there."

The language of this minute, which presumably was read to the council, is significant in its indication that their attention was particularly drawn toward the immense amount of land held in Morris county east of the Lawrence line that had never been located under the East Jersey proprietors.

The minutes of the meeting of June 3d, in Mr. Force's handwriting, are as follows:

"The minutes of the last meeting were read, and on motion of Mr. Condit were accepted and approved.

"The minutes of the executive committee of May 29th were read, and on motion of Mr. Pierepont were accepted.

"An adjournment of one and a half hours being made, this was agreed to.

"At 2½ o'clock P. M. the board reassembled. Mr. Peck advised a reconsideration of the vote by which the acceptance and approval of the minutes of December 4th, 1884, was lost.

"Mr. B. F. Howell claimed a right to make such motion, and moved a reconsideration of the vote upon the acceptance and approval of the minutes of December 4th last past. This was agreed to.

"On motion of Mr. Pierepont, *Resolved*, That the acts and proceedings of the executive committee, together with the minutes of their proceedings, be fully approved. This was also agreed to.

"On motion of Mr. Condit, *Resolved*, That the acts of the register in the surveys made under the authority of the executive committee be approved. This was also agreed to.

"Mr. Force asked that his resignation as register and member of the executive committee be accepted.

"The board then adjourned."

Mr. Force, claiming to act under the resolution above recited, proceeded, and in the course of two years made sales of lands on the beach amounting, including the previous one to Culver & Wright of the Gordon patent, to upwards of $19,000, out of which he claims allowances for expenses and commissions at sixty per cent., which exhaust nearly the whole amount, and upon that claim and account the principal dispute in the cause arises.

I have given the verbiage of the minutes as they appear upon the records. No other contract was ever made between the parties, and they are at variance as to the proper effect of that resolution. The complainants contend—*first,* that it does not by its terms include the beach lands at all, and *second,* that Force should be charged with all the expenses of searching, mapping, &c., incurred by the board under the supervision of himself and Professor Cook, and should be allowed for twenty per cent. of such only as bore fruit. On the other hand, the defendants claim precisely the contrary, viz., that the resolution included all lands in all parts of the complainants' domain, and that Mr. Force had the exclusive right of sale and disposition of all of them, and that all the expenses of searching, mapping and field work should be borne by the complainants, and that he, Force, should be charged with eighty per cent. only of such as bore fruit.

When the complainants filed their bill and procured their evidence they were unaware, apparently, that there was any other record of the resolution in question than that which appears on the minutes of the meetings of the council.

I have already alluded to the fact that there was no book of minutes of the meetings of the executive committee, and that all the record we have of those is found in the loose sheets of paper in Mr. Force's handwriting which were found during the progress of the trial among the papers of the proprietors at their office in Perth Amboy.

The complainants claimed at the outset—*first,* that the resolution was not entered in the minutes as it was actually read to the meeting, and *second,* if it was correctly entered, that its meaning on its face was so explained to the meeting by Mr.

Force and his friends as to exclude the construction afterward put upon it by Mr. Force, and *third,* that even if construed without regard to the verbal explanation, but in connection with the collateral entries in Mr. Force's handwriting, it does not support Mr. Force's claim in this case, which is, as we have seen, to have sixty per cent. outright on all the sales made above mentioned, and to be charged as against that with only twenty per cent. of the actual expenses of the particular cases in which the sales were made, leaving to be borne by the proprietors several thousand dollars of expenses which were incurred in fruitless searches for lands.   In fact, in his account, while claiming credit for some $7,000 paid out for expenses, Mr. Force has charged himself with eighty per cent. of only about $600 of expenses.

In the production of their case complainants called and swore as witnesses five proprietors who were present at one or both of the meetings of May 19th and June 3d, respectively, namely, Messrs. John Kean, Jr., Charles E. Noble, John Rutherford, Aaron Peck and Thomas T. Kinney.   After those witnesses had been sworn, the defendants, who by their counsel had had free access to the books and papers of the complainants, produced some loose slips of paper in the handwriting of Mr. Force, which their counsel had found among the complainants' papers, purporting to be the original rough draft of minutes of the proceedings of the executive committee of December 4th, 1884, and of the council meetings of May 19th and June 3d, 1885.   They also produced one other paper, in Mr. Force's handwriting, purporting to be a minute of the meeting of the executive committee of May 29th, mentioned in the minutes of the meeting of the council of June 3d, but which was not written out upon those minutes.   This last paper was found among Mr. Force's private papers at his house after his death.   The paper, purporting to be a minute of the proceedings of the executive committee of December 4th, 1884, is substantially the same as that entered in the book of minutes of the council.   The precise difference is that the words "60 per cent. of the lands so located or," found in the minutes of the council of May 19th, 1885, have been erased from the original minute produced, and the words "on all sales made," found in the minutes of the council of May

19th, 1885, are not found in the original minute, and upon a careful inspection of the minute of the council these words, "on all sales made," appear to have been written at a different time from that which immediately precedes them.

Another paper found and produced is the original letter of resignation of Mr. Force, dated December 4th, 1884, and addressed to the president of the executive committee.

Two papers in the handwriting of Mr. Force were also produced from the same source and found together, each purporting to be a minute of the meeting of the council of June 3d, when the action of May 19th was reversed. The two are not precisely alike, and they are neither of them precisely like the actual entry in the minute book, and I think it worth while to point out the difference. One of the papers overlooked an adjournment for luncheon, and proceeds to record so much of the proceedings as refer to the matter now in hand, as follows:

"The register submitted his resignation as register and member of the executive committee. Mr. Howell moved that the resolution of non-acceptance of the minutes of December 4th, 1884, be reconsidered. This was agreed to. Mr. Howell moved that the acts of the register thus far gone in his surveys be approved. Mr. Pierepont moved that so far as the action of the executive committee and the register had acted under the resolution of the executive committee of December 4th be fully approved."

It will be observed that this paper makes no mention of any adjournment or any report of the executive committee of a meeting held by them on the 29th of May, or that Mr. Peck advised a reconsideration.

The other paper is a fragment, and reads in this wise:

"At 2½ P. M. the board met, and the opinion that the minutes of the *executive committee in their action of the 29th inst. was but a repetition in effect of the resolution of December 4th, slightly changed, and not strictly parliamentary*, while the record of proceedings showed a refusal to accept the minutes of December 4th minutes; on motion of B. F. Howell, *Resolved*, That the vote as recorded of a refusal to accept the minutes of December 4th be reconsidered; this was by vote unanimously agreed to, and *Resolved* (on motion of Mr. Pierepont), That so far as the action of the executive committee and the register, as shown by the minutes of December 4th, be fully adopted and approved."

Then follows: "The register tendered for acceptance of the board his resignation as register and as member of the executive committee." Here, again, the action on the part of Mr. Peck is omitted.

The paper found among Force's private papers, and purporting to be a minute of the proceedings of the executive committee of May 29th, was as follows:

"Board trade rooms, Newark, May 29th, 1885. The executive committee of the board of East Jersey proprietors met upon notice at 2 o'clock P. M. Members present, Messrs. Noble, Cook, Watson, Lord, Force.

"WHEREAS, At the last meeting of the board objections were made to accepting the minutes of this committee of December 4th last past, on motion of Mr. Lord, seconded by Mr. Watson,

"*Resolved*, That the true intent and meaning of said resolution was, at the time of its passage and adoption by this committee, and still is, that the register be entitled to 60 per cent. out of the sales of the lands located under the return of the surveyor-general, with an allowance of 20 per cent. of cost of surveys."

The admission of this paper in evidence was strenuously objected to by counsel for complainants as not competent, for the reason that it did not come from the possession of the complainants, and there was no proof that it was ever adopted by the executive committee or was the same which was read, if any was read, before the council of June 3d.

I think this objection is well taken, but as each party referred to it on the argument, I will hereafter give it such consideration as I think is due to it.

A fourth paper was produced in the same connection, also in Mr. Force's handwriting, which appears to be *verbatim et literatim,* the original of the actual entry in the minutes, and was undoubtedly prepared as a minute to be submitted to the next council meeting for their approval.

It is here worthy of remark with regard to all the minutes, as well those of the executive committee as those of the council, that though they show resolutions offered by different members of the committee and of the council, yet there is no paper produced showing what those resolutions really were in any other handwriting than that of Mr. Force. That they are not always

to be relied upon as a correct history, appears clear enough from the instance of the minutes of the meeting of May 8th, 1883, with regard to the sale of Lake Grinnell, and also by the rough minutes produced by the defendants with regard to the minutes here in question. Moreover, the correspondence between Mr. Force and Professor Cook, leads one to doubt whether the minute of the resolution of December 4th, as recorded, reads as it was actually passed by the committee, for we find Mr. Force writing to Professor Cook as late as the 27th of April, 1885, shortly prior to the May meeting, stating that he had drawn the resolution of the executive committee "as to the matter of register urging forward the locating of unlocated lands by the East Jersey proprietors," and asking the professor to suggest any modifications or changes, and further saying that—"You will notice that I avoid mentioning any *reconsideration,* and, if necessary, I will say that I refused to act under Mr. Clark's pretended objections." Then follows a transcript of the resolution substantially, but not literally, a copy of that found in the minutes of the council. To that Professor Cook replied on the 1st of May thus:

"The resolution you sent I have read over several times, and think it correct, except that I understood that the proprietors were to pay not exceeding one-half the expenses of surveying (you have it one-fifth). I think this, however, may be judicious, as you have written it. As the time for the annual meeting is close at hand, and we are to have a meeting of the executive committee, I do not see that it can affect anything to say much about Mr. Clark's objections."

It will be seen at once, by a careful reading of the resolution forming the contract between the parties, that it is not easy of construction. Did it apply only to "unlocated lands" as a strict reading of it indicates? If so, then Mr. Force's claim cannot be sustained, for the greater part of the sales producing the $19,000 was not of "unlocated" lands, but of proprietary rights in lands which had previously been surveyed and located under East Jersey rights, disputed indeed, but, nevertheless, actually surveyed and located.

The original suggestion made by Mr. Force to the council at the October, 1884, meeting, as recorded by him, mentions, as we have seen, three classes of lands—*first,* lands held under the pre-

tended patent to Daniel Coxe; *second,* unlocated lands along the beach and elsewhere, and *third,* those held under West Jersey surveys east of the Lawrence line. These, he said, he was willing to undertake to search for, recover and sell at sixty per cent. The correspondence between him and Professor Cook, which preceded the action thereon by the executive committee, showed that he intended to undertake only the lands included within Ocean and Monmouth counties, and to subject the council to the payment of one-half the expenses, but this seems to have met with opposition in the committee, and he contented himself with the resolution as reported.

Counsel for complainants made a very forcible argument that, taking all these collateral writings and the peculiar language of the resolution itself, it should, by proper construction, be confined to unlocated lands lying along or near to the partition line, and he relies particularly upon the preamble or recital which deals only with the *"unlocated lands east of the line of partition;"* and he argued, why use the language "east of the line of partition," since all the lands necessarily were located east of that line, unless the draftsman intended to call particular attention to the great tracts of land located under West Jersey patents; and why speak of "unlocated lands" only when the original suggestion of Mr. Force, before recited, referred to three distinct classes?

That both Professor Cook and Mr. Force had doubts whether the resolution included all lands to be sold is manifest by a letter written by Mr. Force to the professor on October 3d, 1885, several months after the resolution had been adopted. In it he says:

"Shortly a meeting of the executive committee of the board will be called to meet at Newark. I will either use your name to the call or my own as secretary of executive committee. *I enclose a suggestion for your judgment ere I submit it to others* [these words of the last sentence are underscored], to wit,

"*Resolved,* That William M. Force be and that he act as the land agent of the board of proprietors of East Jersey, with authority to locate, under the approval of the surveyor-general, any unlocated lands of the East Jersey proprietors, and that he be entitled to 60 per cent. of such lands, or 60 per cent. of the proceeds thereof when sold, and that this resolution shall also have effect during the time he has served as register of the board."

The object was not only to clear up all doubts as to the scope of the resolution of the previous May, but also to make it retroactive and to relieve him of any expense.

Then another question arises as to what was meant by "surveyor's fees," out of which he was to be allowed twenty per cent. The proof is very clear that the principal work of the surveyor in finding and locating vacant lands did not consist in going on the ground and measuring with chain and transit, but in the plotting and mapping of various surveys on paper in such a way as to show vacancies. And this is properly surveyors' work. In point of fact, as we have seen, a great many certificates of surveys are made by deputy surveyors where they do not go upon the ground at all, but rely upon the descriptions contained in former surveys on record in the office of the register at Perth Amboy. Roome's Dunkei pond survey is an instance. The proofs show that much the greater part of the expenses incurred by the proprietors in the matter in hand was in paying surveyors for mapping and plotting in the office at Perth Amboy, and this was, confessedly, the only mode in which the actual vacancies could be ascertained.

Then, again, by the terms of this contract the question arises, Upon whom was cast the burden of the immense expenses to which the proprietors were subjected, upon the recommendation of Professor Cook and Mr. Force, in hunting for lands all over the eastern division of New Jersey? For it is proper to remark here that that work went on from 1884 and 1885 forward, and included not only extensive and expensive investigations in Sussex and Morris counties, but hundreds of dollars spent in plotting the surveys upon the Newark meadows between Elizabeth and Newark, looking for vacant land there. And this is the very kind of work which Mr. Force, in his suggestion to the proprietors in October, 1884, stated to be a part of that for which the sixty per cent. was to be allowed, and in the contractual resolution itself the register is directed "to proceed to have the records examined with the view to locating and making sale of all unlocated lands," and for this service he was to receive sixty per cent. of sales. And for all this work bills were made out to the proprietors, and part of them paid for by the treasurer of

the proprietors, and the balance by Mr. Force, and brought in against them as an offset to their claim against him for moneys received on the sale of lands.

The work of looking for lands to sell and making sales went on *pari passu* under the contractual resolution which requires the

"register to proceed to have the records examined with a view to locating and making sales of all unlocated land, and that he have compensation for such services to sixty per cent.," &c.

Now, was he by this resolution to do that work at his expense, and get back from the proprietors twenty per cent. on the sum he might expend, or were the proprietors to bear the expense, and he to be charged with eighty per cent. of the expense of those searches only which resulted in finding lands which could be sold and a return made therefor? Mr. Force claims, notwithstanding the language of the resolution just quoted, that the council was to bear all the expenses, which, as before observed, amounted to about $7,000, for these investigations, while he was only to pay eighty per cent. of that part of it which produced results.

Without at present answering these questions, I will proceed to refer to the evidence of the witnesses on both sides as to what occurred at the meeting of June 3d.

Mr. Aaron Peck, a highly respectable gentleman, and one of the proprietors, swears that he was not present at the meeting of May 19th, 1885, when the council refused, by a decided vote, to approve the resolution in question, but he heard from Mr. Amos Clark, Jr., what was done, and attended the meeting on June 3d. At first he was decidedly opposed to the resolution, but changed his mind as the result of an interview with Mr. Force. Whether that interview occurred before the meeting of June 3d, or on that day, between the morning and afternoon session, is not quite clear. I am inclined to the opinion that the interview occurred on June 3d, after the morning meeting. Be that as it may, I am entirely satisfied that Mr. Peck's recollection that the interview did occur is reliable and accurate, and he says that Mr. Force sought the interview and explained to him that the resolution referred to the lands lying east of the Lawrence line and

on the disputed boundary strip or gore between East and West Jersey, which lands were held under West Jersey warrants, and had never been located under East Jersey warrants, and that he (Force) was willing to undertake the risk and expense of recovering them at sixty per cent., and that the resolution was not intended to apply to the beach lands. On the strength of that statement by Mr. Force, he (Peck) went into the meeting and advocated the approval of the resolution, and, for the purpose of producing that result, stated to different members of the council, across the table in a conversational way, the explanation which Mr. Force had made to him, and after such explanation was made the resolution passed.

Mr. Kean swears that there was considerable discussion as to the scope of the resolution, and, as he understood it, and as it was explained to him, it did not include the beach lands, but applied only to the lands to be discovered and located east of the Lawrence line in Morris and Sussex counties, being the lands which had been talked about from time to time by Professor Cook and Mr. Force in the council as promising profitable results to the proprietors.

To the same effect is the evidence of Mr. Noble. He did say that he understood the resolution applied not only to the lands which were held east of the Lawrence line under West Jersey patents, but also to other lands, but that it did not include beach land. Counsel for defendants relied strongly in his argument upon the fact that Mr. Noble did mention other lands, but I construe his answer to apply to those other pieces of land scattered through Morris and Sussex counties which had never been located under West or East Jersey, and which, it will be remembered, constituted one of the classes of lands from which Messrs. Cook and Force were promising profit to the proprietors.

To the same effect is the evidence of Mr. Robert W. Rutherford. Mr. Rutherford emphasized his evidence by saying that the council of proprietors already knew all about the beach lands, and, as he expressed it, it had been decided that they owned those.

Messrs. Condit, Little and Watson were called for the defendants, and a careful examination of their evidence seems to me to

make in favor rather than against the complainants' contention that the resolution was explained, at least, at the meeting to apply only to the lands lying east of the Lawrence line which had been located under West Jersey patents.

The evidence of Mr. Little, who had attended several of the sessions of the court and heard much of the evidence, and who was the friend of Mr. Force, is particularly significant. Under the examination of counsel for the defendants he testified thus:

"*Q.* Have you this morning, in the courtroom, examined the resolution of the executive committee as recorded on page 158 of the minutes of the proprietors in Book of Minutes D?

"*A.* I have not.

"*Q.* Will you look at the resolution?

"*A.* There it is. [The witness, after reading the resolution, said:] I remember such a resolution: yes, sir.

"*Q.* And was that resolution also presented by the executive committee at the June meeting?

"*A.* Yes, sir; that is the same as I remember it.

"*Q.* Now, will you state what the resolution was, as nearly as you can remember it?

"*A.* Well, as I remember the resolution—I have heard bits of testimony here, but never had access to the book; I got the book this morning, but turned it·over to Mr. Condit without looking at it—that the intention of the resolution was—you want me to speak of the May or June meeting now?

"*Q.* Well, I speak of the resolution as it was offered by the executive committee.

"*A.* Yes; well, that was in reference to the compensation to Mr. Force of sixty per cent. and an allowance, and so forth; and at the May meeting it met with some objections; and as I would remember, the prominent parties was John Kean and Amos Clark and Thomas T. Kinney; then at the June meeting this resolution came up, and *Mr. Peck talked upon the resolution of what this was to cover, and I never had any other idea in my head only to cover the West Jersey location in East Jersey, and the angle or gore lots.*

"*Q.* What do you mean by 'the angle or gore lots?'

"*A. I mean by the difference between the Lawrence line and the Keith line, and the quinti-partite line, and they were referred to as upon the maps upon the table.*

"*Q.* (By the court.) *I understand you to say, then—I want to repeat it now, for your voice is so low—that you had no other idea in your mind from what was said there except that the resolution referred to the West Jersey encroachment and what laid in what is called the disputed gore?*

"*A.* Yes, sir; *that is all there was.*

"*Q.* (By Judge Stevens.) Well, anything else?

"*A.* Not upon that point.

"*Q.* What?

"*A.* Nothing more upon that point, only the resolution at the June meeting the executive committee was sustained.

"*Q.* Well, was anything said about the beach lands?

"*A.* That was in discussion; that was in discussion, but I, not being familiar with that—I remember a discussion in regard to it.

"*Q.* Well, what was the discussion?

"*A.* Well, something about beach lands being embraced into it, but just where they were—they were down in Jersey, and out of my latitude."

And further on, after being exhaustively examined and pressed by the defendants' counsel, this question was put by him:

"*Q.* Now, I ask you whether any statement was made as to what lands were intended to be embraced within the scope of the resolution as indicated by those maps?

"*A. It was all West Jersey surveys in East New Jersey, and all the land that was included in the angle or gore lots; and some had located on West Jersey rights in East Jersey, and vice versa, and they had had an opportunity to correct the title of East and West Jersey locations, and some had done it; and the discussion went along in that way.*

"*Q.* Was any reference made to the beach lands?

"*A.* I remember the Coxe—I remember the Daniel Coxe.

"*Q.* Patent?

"*A.* Yes, sir; I remember that.

"*Q.* Well, any other beach lands?

"*A.* Well, I could not tell now unless I heard the names, because I didn't take the interest in lower New Jersey that I did at home or in that vicinity."

This is the evidence of a friend of Mr. Force who is called by the defendants, and, as such, has much significance.

My conclusion is that I must consider the oral evidence just recited as showing that the scope of this rather vague and ambiguous resolution was inquired into and discussed by the council, and that at the request of Mr. Force and in his presence it was explained, as is shown by his own minute, by Mr. Peck, as applying only to lands in Morris and Sussex counties not appropriated or located under the East Jersey proprietors.

This view is, I think, supported by the resolution found in the paper before referred to, purporting to be a minute of the proceedings of the executive committee held May 29th, 1885, between the two meetings of the council on May 19th and June 3d. That resolution is sufficiently broad, sweeping and unequivocal in its terms to include all the lands here in question,

since it was clearly not confined to "unlocated lands," but to all land thereafter to be located by the surveyor-general. Now, it either was or was not approved by a meeting of the executive committee on May 29th. It was certainly prepared by Mr. Force, either at or before that meeting, for the purpose of receiving the approval of the executive committee, or it was prepared afterwards. Now, if it did receive the approval of the executive committee, then I see no reason why it should not have been treated as other minutes of the executive committee were by being reported to the council, and, if approved, entered on the minutes of the council; and if it had been approved by the executive committee and reported to the council as the minutes of the council say it was reported, then it must, in the ordinary course of business, have either received the approval or disapproval of the council. Now, if it received the approval of the council, then I see no reason why it should not be entered on the minutes.

And just here comes the peculiarity of one of the papers purporting to be a rough, but fragmentary, minute of the meeting of June 3d, which is above recited. It commences at the top of the paper with these words:

"during which time a motion to adjourn for dinner prevailed. At 2 :30 P. M. the board met, *and the opinion* [sic] *of the minutes of the executive committee in their action of the 29th inst. was but a repetition in effect of the resolution of December 4th, slightly changed and not strictly parliamentary, while the record and proceedings showed a refusal to accept the minutes of the 4th,*" &c.

Now, I am unable to see anything unparliamentary in the committee declaring by resolution just what it did mean by a previous resolution reported to council, which evidently was capable of being misunderstood, and which had led to discussion as to its meaning; and if such explanatory resolution was reported to the council, I see no reason why that body should not adopt it if it approved it, and their action be entered on the minutes with the resolution at length. Such action of the council would have dispensed with the lengthy discussion which confessedly took place as to the meaning of the original resolution. Hence, as it seems to me, the statement just quoted, found in the fragment of a rough minute, taken in connection with the

failure to record it or the resolution in question in the book of minutes of council, amounts, in effect, to a statement that it did not meet the approval of council. And then it follows that the fact that Mr. Force prepared the resolution of May 29th shows at once that he did appreciate the fact that the resolution of December 4th might be so construed that it would not include the beach lands. The result is, it seems to me, that the existence of that paper, under the circumstances, and in the light of the other collateral and cotemporaneous papers and entries, makes against, rather than in favor of, the defendants' contention.

It is objected by the defendants that the oral evidence above recited is not competent to explain the writing or to restrict its effect, and that Mr. Force is not estopped by what occurred in his presence from falling back upon the literal construction of the contract. It was argued with much earnestness that there was no proof that the council acted upon the statements made by Force to Mr. Peck. But in the face of Mr. Force's entry in the official minute that "Mr. Peck advised the reconsideration of the vote," and of the direct evidence of Mr. Peck and Mr. Little on that subject, and of the fact that Mr. Force was present when the explanations before mentioned were given, I am unable to perceive how he can now be permitted to claim, as against the proprietors, that the resolution has a different significance from that which he knew at the time the council attributed to it.

I think the moral rule of Mr. Paley has some application here, viz.:

"When the terms of the promise admit of more senses than one, the promise is to be performed in that sense in which the promisor apprehended at the time that the promisee received it." *Chit. Cont.* (*11th ed.*) *104.*

Professor Parsons, in his treatise on contracts (*2 Pars. Cont. part 2 ch. 1 § 3 (5th ed.) 499*), says:

"So, too, the situation of the parties at the time, and of the property which is the subject-matter of the contract, and the intention and purpose of the parties in making the contract, will often be of great service in guiding the construction, because, as has been said, this intention will be carried into effect so far as the rules of language and the rules of law will permit. So the moral rule above referred to [Mr. Paley's] may be

applicable, because a party will be held to that meaning which he knew the other party supposed the words to bear, if this can be done without making a new contract for the parties."

It seems to me that it would be highly inequitable to permit Mr. Force, having admitted to have received about $19,000, money belonging to complainants, to retain a large portion of it upon a construction of the contract different from that which the complainants were induced by his active efforts to put upon it, or, at any rate, which with his acquiescence they did, in fact, put upon it.

It is quite manifest that Mr. Force all the while intended to claim the whole sixty per cent., and also that he thought he might have difficulty in inducing the council to accede to his claim.

This is shown by the correspondence between himself and Professor Cook, which has been put in by the defence, subject to objection by the complainants. The ground on which it was offered was that Professor Cook was the official representative of the council, and his letters to Mr. Force ought to bind the council. I cannot take that view. Professor Cook was simply surveyor-general and one of the executive committee. His duties as surveyor-general did not authorize him to bind the proprietors, except in matters of the actual survey and allotment of lands, and the same may be said of his power as a member of the executive committee, and therefore I am of the opinion that the letters were not competent. However, they were commented upon by both parties in argument, and I will give the result of my examination of them. Indeed, I have already alluded to some of them.

After the meeting of the council of October, 1884, and previous to the meeting of the executive committee of December 4th, 1884, Mr. Force wrote to Professor Cook notifying him of a meeting of the executive committee, and uses these words, referring to the terms upon which he should undertake to make a sale of the lands under the suggestion above recited made by him to the council at the previous October meeting:

"Please outline what you think would be best for me to undertake on the terms for the board. I am willing to take Ocean and Monmouth

counties, one reason of which is, one who can direct with confidence can effect much more than if delayed for the uncertainty of a board meeting, and more effort to secure results will be developed.   I would like included half the expense for surveys.   They are now willing to give 50 per cent. It is certainly worth something to organize and manage, but I will be content with your discretion."

In answer to that letter Professor Cook wrote that he thought that the terms of having one-half of the expense of surveys would be fair, and suggests that not himself, but some other member of the committee should make the motion.

It appears that there was a meeting of the executive committee between that date and the 1st of December, in which Mr. Force's plans met with opposition, for on that day Mr. Force writes Professor Cook that he is dissatisfied, and proposes to call a meeting of the council of proprietors and to tender his resignation.   All this is before the meeting of December 4th.

On the 26th of May, 1885, after the meeting of May 19th, and before that of June 3d, Professor Cook writes to Mr. Force with regard to the refusal of council to approve the resolution of the executive committee, in which he speaks of the result of that action as being equivalent to a vote of a lack of confidence; discusses the amount of compensation Mr. Force was asking, and then hints at compensation for himself in these words:

"What has been paid to the surveyor-general in former times—perquisites, fees or lump payments?   Or has he been left to make his pay *by taking advantage of his position and knowledge of the proprietors' affairs?*   It may be well to have that subject brought up and defined."

Then adds this:

"If there should not be any satisfactory action or conclusive one, it may be well to let matters go for six months, and in that time to locate our rights and have that matter cleared off.   The large amount of rights located on Sandy Hook [referring to the joint enterprise of himself, Russell and Force] is mostly (not all) a mislocation, and should be returned, retaining the part which is an accretion from Shrewsbury.   This could be done under Mr. Browning's opinion.   What upon the whole is best to do we must determine in part for ourselves and part in executive committee."

This letter shows clearly that Professor Cook was acting in concert with Mr. Force, and we shall see further on that such concert of action became closer and more thorough.

Next, we have one of October 6th, 1885, from Cook to Force, four months after the meeting of June 3d, in which he uses this language:

"To me there seems no objection to making it in the executive committee. [This evidently refers to something which had been discussed between them orally.] Mr. Clark probably will not come, and if he does, *we shall outvote him*, and our proceedings are then perfectly open. It would be well, however, to have the other gentlemen you mention also present."

Then comes this:

"The more I think of your plan for ascertaining and selling what property we have left the better I like it. The percentage is not too large. *In regard to the surveying, I think the plan will go most favorably with weak and unenterprising members if the cost of surveying is first paid from the sales and the balance divided, and the expenses already incurred and paid from the proprietors' funds may be reimbursed in the same proportion as the lands already surveyed are sold.* This, which is a minor matter, should be put so as not to arouse any questioning from those who want to hold back."

This shows that they were already discussing the question as to what should be done with the great expense the proprietors had incurred, and were still incurring, under the direction of the professor and Mr. Force in hunting for vacant land.

On November 17th, 1885, Professor Cook writes to Mr. Force, suggesting that they should have Mr. Kean, who was opposing their plans, removed from his office of treasurer. Then he encloses a bill for surveyor's services, which was audited and approved, and proposes to send all the bills of surveying to be filed at Perth Amboy, then adds this:

"The business of the board which you are doing is not appreciated fully from their not understanding it, and perhaps having no active belief that there is anything worth spending money for. *When anything further comes in you will not find the least hesitation about paying your proportion, and when the back survey bills are being settled there will be an opportunity to revise the pay of the Gordon sales.*"

This relates to the sale made of the Gordon patent to Culver and Wright in May, 1884, a year before the adoption of the sixty per cent. resolution.

On the 23d of March, 1886, Mr. Force writes to Professor Cook, summing up all his sales to that time to $10,000, and then says:

"I have paid very liberally for expert services, securing customers, and commissions on sales, which secured the service. * * * There is much more yet to be done. I think the way is opening for us to public confidence, and prejudice will subside under proper care. The undertaking has been quite a bold one, though we have done well, I think. I have not footed up the expenses yet, but have paid Thomas up all but say $100, thus keeping him in my service. Without him I could have done but little. *When I see you I want to talk over expense matters, &c.,* AND GET AT A SUM TO PAY YOU. *I am seeking for myself 30 per cent. net;* over and above this goes to Thomas [which was twenty per cent.], *the surveyor-general's account and expense account* (that is, legitimate expenses under the resolution of the board). I make this statement that it may be understood should anything happen to either of us unexpectedly."

This indicates a division of the sixty per cent. as follows: Twenty per cent. to Thomas, thirty per cent. to Force, and ten per cent., less expenses, to Professor Cook.

Among the papers in Mr. Force's handwriting, found in the office of the proprietors after he left, and produced by the complainants, is one containing a statement, all in his handwriting, of different rights (warrants) of location and proprietary rights (shares), called "proprieties," which he had purchased, some of which went to Professor Cook, with a memorandum that they were paid for by him, Force, and the whole is endorsed—"Statement of rights of Professor Cook, propriety, &c. Cook to pay one-third of the Sandy Hook; if so, he will owe me fifty acres." In that paper is a statement in Mr. Force's handwriting containing a footing of the whole sales which he had effected up to that time, amounting to $19,179. Then is added:

"The above equal, at 10 per cent., $1,917.
"Take from this, paid for rights, ———.
"Take from this, paid for propriety, ———."

without carrying out the amount.

I think this indicates pretty clearly that Mr. Force intended to allow Professor Cook ten per cent., less his, Force's, share of the expenses, upon all the sales that he made for the proprietors, and charge him, on the other hand, with the cost of the rights of location and propriety interests which he had bought for him and paid for. The effect of this arrangement was to make Professor Cook directly interested in reducing the part of the expenses to be charged to Mr. Force by saddling as much as possible thereof upon the proprietors. About this time, also, it is to be remarked, Mr. Force was dividing with Professor Cook the proceeds of the sale of the Upper White and Dunker's ponds.

On May 6th, 1886, which was just prior to the regular semi-annual meeting of the council in that month, and after Mr. Force had made considerable sales of the lands, he writes this letter to Professor Cook:

"I have been examining accounts with proprietors, and find I have paid out for their account say $1,200 on bills ordered paid but not drawn from Mr. Kean. I think it may be well to change the treasurer. He pays no attention to the duties. By his report he shows $1,500 lying in his bank unemployed. He performs no duties, gives no time or attention. I have on this sheet suggested making my sales account wholly distinct from current expense account in the form, you will notice. In this there can be no mystery to anyone. Should you see some other form, please suggest it, that I may have all in clear and satisfactory shape and form,"

and then adds form for statement of account.

In reply to that, Professor Cook writes on the 8th of May, 1886:

"Yours of the 6th is received. Mr. Blakeley [that is, the surveyor employed under the direction of Professor Cook and Mr. Force] was here on Thursday. He brought his journal of daily work and his expenses by items. As a tentative effort, we went over his account and marked it under three heads: 1. Work like that done at Swartswood to be put in a bill by itself, and I to see it settled. 2. *All work and expenses in searching and arranging records and materials for future sales in Sussex, Morris, Ocean, or any other part of East Jersey, to be called office expenses; this is to be paid entirely from the proprietors' funds.* 3. Such expenses as have been incurred in preparation for and in making sales to be charged to the account of contract expenses, and to be divided and paid, 80 per cent. from your share and 20 per cent. from the proprietors' share of the sales. *In what is now office expenses* it may be that after the next settlement after sales, if some of what has been paid as office

expenses should be transferred to the contract expenses and divided between yourself and the proprietors. There will always be an account of expenses incurred by the office and myself, for which corresponding sales must necessarily come at a later date. Does this division accord with your plan, and is it equitable?"

Now, considering that Force's letter of the previous March shows a clear intention on his part to divide his profit with Professor Cook, this letter of May 8th is significant. It shows a plan of these two gentlemen to do what Mr. Force did in his final account, namely, charge against the proprietors all the expenses of making maps and surveys, and credit them back with only eighty per cent. of so much of them as should prove fruitful in producing results. And such a mode of adjusting the accounts was necessary in order to so reduce the expense account as to leave something out of the ten per cent. for Professor Cook. But it seems to me quite inconsistent with the letter and spirit of the contractual resolution, which was that Mr. Force should do the searching, primarily at his own expense, and then charge back to the proprietors twenty per cent. of so much of it as bore fruit. The logic of the language of the contract is that Mr. Force was to charge the proprietors twenty per cent. of moneys *he* had expended, and not that the proprietors were to charge Mr. Force with eighty per cent. of money *they* had expended.

The minutes of the regular semi-annual meeting of the council, held May 18th, 1886, show that Mr. Force had made a statement to the executive committee three days previously, showing in detail the sales up to that time, amounting to $10,884, and also a statement of expenses incurred in surveying, &c., and other bills which are not footed up, but not giving any statement of the amount of his claim for commissions and surveys.

On the 26th of May, a week later, he writes a long letter to Professor Cook, in which he states that he is engaged in "making up statements for examination of yourself and executive committee." The letter is too long for quotation at length, but it shows that he was exercising some ingenuity in making up his statement of account in such a way that it would probably be satisfactory to the executive committee and council. A day later Mr. Force receives a reply from Professor Cook, in which is this significant language:

"*I think it quite as well not to have made a full settlement at the annual meeting. The amount of expenses, compared with the receipts, will probably make a better showing next fall than they do now.* &ast; &ast; &ast; If you consider the Jennings bond a good one, and that your claim covers it, as I have no doubt it does, I see no reason why it should not be assigned to you."

The Jennings bond was part of the consideration received on sale of land.

Further sales, and, in fact, I think all, amounting to upwards of $19,000, were made before May, 1887, and reported to the executive committee in detail, but without any statement of the account between Mr. Force and the proprietors. But that Mr. Force was preparing his account with care is manifest from a letter which he writes to Professor Cook on May 19th, 1887, two days after the semi-annual meeting of the council. In it he desires the professor and Mr. Blakeley, the surveyor, to go over the latter's account, and charge Mr. Force with what he should pay of the general bills, to avoid dispute with the board when his account is submitted; then he uses this significant language:

"*I am now desirous to adjust with others the percentage, deducting the expenses.* By thus being prepared I can meet boldly all questions and be sustained on the basis of the resolution. And should any change take place in the matter of sale, &c., I can claim my interest in the preliminary work I have been doing. I do not desire to be charged with ordinary office expense or materials for account of the general board, but such as are proper for me to pay under my contract. Through Mr. Blakeley *and yourself* I can feel safe and be protected in case of misunderstanding."

The letter, taken as a whole, is quite suggestive, but too long for further quotation.

At the October, 1887, meeting of the council Mr. Force, according to his minutes, submitted a detailed statement of his receipts and expenditures and disbursements, and it was resolved that he submit the same to the action of the board; and then, on motion, the statement of the register was referred to a committee to examine same and report. Messrs. Ward and Tichenor were appointed that committee.

At the May meeting of 1888 the committee made their report, dated May 15th, 1888, to the effect that they

"had examined the books and vouchers presented to us, and find that from the book of minutes the register has been authorized by the board, from May 20th, 1884, to May 17th [*sic*], inclusive, to pay bills amounting to $2,870.47, but many of the vouchers therefor have been mislaid. On account of mappings, surveyings, &c., the register had paid to G. H. Blakeley $3,297.84, to J. H. Porter $83.33, and to N. B. K. Huffman $748.07, as per their receipts. The sales of the land reported by the register amount to $19,054, showing a balance due the proprietors of $12,054.29, less the commissions due to the register of the board."

Then follows a recommendation that the register should be relieved of the task of receiving and disbursing money which properly belongs to the treasurer.

It will be seen at once that this report amounts to no more than a mere verification of the footings of the account and shows no evidence of any careful investigation of it, and in point of fact the proof shows that none was made, and anything like a careful investigation would have discovered the palpable errors hereafter to be referred to.

The account thus dealt with is entered at length on the minute book at the end of the minutes of this meeting. It is composed of several separate sheets of bills and receipts, the charges containing four items of $2,870.47, $3,297.84, $83.33, $748.07, making a total of $6,999.71. He charges himself with sales of land in detail amounting to $19,054, leaving the balance found by the committee of $12,054.29. Then is added: "The register is debtor to forty per cent. on sales of $19,054, amounting to $7,621.60, and to eighty per cent. of surveys on sales made $437.85." The cash balance of $12,054.29, mentioned in the committee's report, does not appear in the statement, nor is there any footing to show how the account actually stood, but I make his total debits against the proprietors $18,432.11 and his credits $19,491.85, leaving a balance due the proprietors of $1,059.74. Whether this result was made known to the council and understood by them does not appear, nor does it appear when the account was entered at length on the minutes, for its appearance there is subsequent to the president's signature to the minutes, and that signature is usually appended after the minutes have been read and approved at the next meeting, which was October, 1888.

I find no resolution was passed approving the account, nor does it appear that any discussion occurred.

The report of the auditing committee, above in part recited, is entered on the minutes *verbatim* with the signatures of the committee, precisely as in the original document. Between the body of the report and the signatures are squeezed in, evidently written afterwards, these words, thus (including the last line of the report) :

"belongs to the office of treasurer. *On motion the report was accepted and the committee discharged.*

"F. M. TICHENOR,
"MARCUS D. WARD,
"*Committee.*"

and after the word "accepted" is an erasure of a word which, under the glass, seems to me to have been "approved."

The minutes of the next meeting of the council (October, 1888) state that it was moved and agreed that the executive committee should make settlement with the register for lands sold by him, and report to the next meeting.

The minutes of the meeting of council of May, 1889, record a meeting of the executive committee on April 18th, 1889, stating that Mr. Force submitted a supplemental account to the committee charging himself with $1,059.74 as the balance due on his previous account, and charging the council with various items, including a payment of $302.24 to the treasurer. The minute does not state who were present at this meeting, or that any discussion took place. This supplemental statement is incorrect on its face, as it mixes debits and credits, and the payment to the treasurer, for which credit is claimed, was not made until a month later.

It appears that at the May meeting of 1888, when Ward and Tichenor made their report, Mr. Kean was relieved of his office of treasurer, and Mr. Watson, who was friendly to Mr. Force, was appointed in his place, and on May 20th, 1889, Mr. Force paid him $302.24. The receipt is in Mr. Force's handwriting, is somewhat peculiar, and reads thus:

"Received of William M. Force, register, payment for sales of Logan tract, $120, and William Thompson, $50; also check for balance on account, per statement rendered, $303.24."

Professor Cook died in September, 1889. On the 15th of October, 1889, Dr. Goodridge, a comparatively new proprietor, was elected surveyor-general in his place. Between that and the next meeting Dr. Goodridge, for the purpose of learning the duties of his position, made some examination of the records and affairs of the proprietors, and came to the conclusion that the accounts of Mr. Force and his conduct would not stand examination, and indicated his suspicions to several members of the board, with the result that at the May meeting, 1890, Mr. Force was not re-elected register. His account was submitted to an expert accountant, with such vouchers as were furnished, with the result that large and palpable errors were found in it. Upon the report of the accountant and the investigation of Dr. Goodridge this bill was filed.

The bill charges, among other items, that Force failed to charge himself with certain moneys received from sales of land, amounting to less than $300. These are either admitted by the answer or proven.

The bill charges, further, that Mr. Force in his account made double charges, to a large amount, of moneys paid, and also charged as paid by him, to a large amount, moneys which had been in fact paid by the treasurer, and that these errors, overcharges and omissions amounted to some $1,910.99. These errors were admitted by Mr. Force before the bill was filed, but he charged against them certain items of moneys paid by him for which he had never received credit from the proprietors, amounting to $634.02, which, according to his contention, showed that the errors would amount to $1,276.97 as against him, and alleged that he paid that sum of money to the complainants.

Complainants by their bill further charge that he was not entitled to commissions on the sale to Culver and Wright in the spring of 1884, a year before the sixty per cent. contract was made. But they say, further, that if he is to be credited with commissions on that sale, his mode of stating it is incorrect in

this, that he should have charged himself with the whole $2,600, and with eighty per cent. of the $600, amounting to $480, which, upon his own statement made at the time, was expended in surveyors' fees, &c., paid to Mr. Irons, so that the whole charges would be $3,080, and the credit to him would be sixty per cent. of the $2,600—$1,560—and $500 paid to Mr. Irons, making $2,060, leaving a balance due the proprietors of $1,020 out of the $2,600, instead of $800, as the result of his mode of stating the account. In other words, that his mode of stating the account is erroneous as against the proprietors to the extent of $220.

I think both these points are well taken, and that Mr. Force cannot, under any construction of the resolution, claim any commission on this sale to Culver and Wright; and further, that if he is entitled to it, the account should be stated in the way indicated. That he himself so understood it is manifest by a partial account in his handwriting, produced by the complainants, in which he charges himself with the Culver and Wright sale at $2,600, as it should be.

The complainants charge—and their charge in that behalf resulted in much argument—that these mistakes in the account were intentional on the part of Mr. Force, and therefore positively fraudulent. On the other hand, it is argued that they were purely accidental, and due to the loose manner in which the proprietors did their business and kept their accounts. But I think the defendants' position on that point is without the least foundation. The cash business of the proprietors had been conducted by a treasurer who had kept his accounts in a businesslike manner. Mr. Force, as we have seen, of his own accord, and, as clearly shown by the correspondence, for his own ulterior purposes, assumed to ignore the treasurer, and received and disbursed these moneys himself. Now, he is admitted upon the record to have been a man of mercantile and general business experience, and it certainly appears by the documentary evidence that he was a man of great acuteness and general intelligence. All his payments seem to have been made by checks, and I am unable to see how there could have been the least difficulty in his making up an account against the proprietors that would have

been free from any mistake. The mode proposed in his letter to Professor Cook of May 6th, 1886, would have so resulted, and from a careful examination of the account itself, and the vouchers upon which it is based, it seems to me to indicate that it assumed the shape it did on purpose to confuse and mislead. An account better adapted for that purpose I have never seen. The vouchers of the surveyors, &c., are so arranged as to make it difficult to understand it. Nor was it gotten up hurriedly. We have already seen that he took considerable time to prepare it, and his letter to Professor Cook of July 22d, 1887, shows that he knew that of the sum which he charged to the proprietors as paid by him $425.17 had been actually paid by the treasurer, and that he was then engaged in making up his account, which was presented to the council the next October.

But I consider the question of actual fraud in preparing the account of little consequence. The complainants pressed it in answer to the point made by the defendants that the account had been submitted and acquiesced in by the proprietors to such an extent as to make their conduct a bar against their further questioning it. I am unable to accord to the defendants the benefit of acquiescence to that extent. The fact is that during Professor Cook's life he and Mr. Force had complete control of the affairs of the proprietors, and managed to have a majority of the executive committee and of the council in their favor. All the circumstances and correspondence show that Professor Cook was colluding with Mr. Force to have his account passed as presented, and no doubt the council listened to his suggestions and advice as coming from a disinterested person, which they supposed him to be, while in truth he was not disinterested, but, as we have seen, was directly interested in sustaining Mr. Force in his position.

No estoppel can arise against the proprietors, because no irretrievable action has been taken by the defendants based upon their silent acquiescence. They acted as soon as they discovered the errors in question, and ascertained their rights under the contractual resolution.

The conclusion at which I have arrived upon all the issues discussed is, in the main, against the defendants. None of the

lands (with the possible exception of a trifle near the southerly end of the Lawrence line) whose sale was negotiated by Mr. Force, and from whose proceeds he claimed sixty per cent., were, in my opinion, within the purview of the contractual resolution as it was explained to the council at the instance, and in the presence, and with the acquiescence, of Mr. Force, and was understood by them. None of the lands, unless it be a trifle, were within the imaginary gore east of the Lawrence line which was claimed by the West Jersey proprietors as the result of the final determination of the boundary between New York and New Jersey, and, as before remarked, the greater part of the lands conveyed were not, properly speaking, unlocated, but were claimed under prior East Jersey locations whose validity was questioned, and the conveyances of them were confirmatory only.

Mr. Force himself prepared the contract, and is responsible for the vagueness, ambiguity and uncertainty of its language, and I think that we should apply here the maxim that "the words of an instrument shall be taken most strongly against the party employing them" (*Broom Max. 594, 597, 598*), and applying that rule, it seems to me difficult to answer the argument of the counsel of complainants made upon the writing itself in connection with the collateral writings, as applied to the subject-matter, both as to the lands properly within the scope of the contract and as to the party who was to bear the expenses of searches, plotting and field work. So plain is this latter to me that if I were constrained to adopt defendants' view of the first part of the contract, I should still feel constrained to charge the accountant with all the expenses of searching, mapping and field work done after the adoption of the resolution.

But these conclusions, though adverse to the defendants, do not, in my judgment, have the effect of entitling the complainants to a decree for all these moneys. Mr. Force undoubtedly did great and valuable services to complainants. But for his energy and shrewd management, most, if not all, of these moneys would never have been received, and there is great force in the suggestion of his counsel that he earned them all. But if that be the fact, and if it be true that all that he received was no more than sufficient to compensate him for his work, it does not

give him the right to manage, by rather unfair means, to appropriate to himself the whole fund at the expense of the complainants, for he sold these lands as the lands of the complainants, and as their agent and trustee, a position which he voluntarily assumed, upon promise to complainants to give them substantial results.

Nor in my opinion does it, on the other hand, give complainants the right to take all the fund and allow him nothing for his services. They- have appealed to a court of equity to enforce a pure equity, and have thereby come under the obligation to do equity.

The question as to what would be equitable in view of the result at which I have arrived was not discussed by counsel, and I am unwilling to determine it without hearing counsel.

I will therefore hear counsel upon the following points:

*First.* The whole of the consideration money for Dunker and Upper White lakes having come into Mr. Force's hands, is he liable to a decree for the whole, or only for the one-half which he retained?

*Second.* In accounting for the proceeds of sale of Lake Grinnell, is he to be allowed for the amounts that he paid to Messrs. McCoy and others, his associates in the enterprise?

*Third.* Upon what basis shall his compensation for all the services which he rendered the proprietors be ascertained?

Having heard counsel upon the questions reserved, I have now to state my conclusions thereon.

We have seen that, with regard to the sale of the lakes, Mr. Force occupied the position of an agent and trustee of the complainant who had been entrusted with the power, and assumed the duty, of selling these lakes on account of, and for the benefit of, the complainant, and that these several sales were, under the circumstances, clear breaches of trust.

Two principles applicable to the case seem well established.

*First.* That the measure of the equitable damages which a *cestui que trust* is entitled to recover against his trustee as compensation for a breach of trust is, at the option of the *cestui que trust,* (1) the amount the *cestui que trust* has actually lost by the breach, or (2) the amount, if anything, which the trustee

has gained thereby. *2 Lew. Trusts (Flint's ed.)* \*900, \*902, \*903; *Hill Trust.* \*522; *2 Pom. Eq. Jur.* §§ 1051, 1058, 1080; *Attorney-General* v. *East Retford, 2 Myl. & K. 35; Melick* v. *Voorhees, 24 N. J. Eq. (9 C. E. Gr.) 305; S. C.,* on appeal, *25 N. J. Eq. (10 C. E. Gr.) 523; Ackerman* v. *Halsey, 37 N. J. Eq. (10 Stew.) 356; S. C., 38 N. J. Eq. (11 Stew.) 501.*

*Second.* That a liability to make good a loss resulting from a breach of trust participated in by more than one trustee is both joint and several, so that each guilty trustee is liable for the whole of the loss. And it is difficult to perceive how there could be any other rule, since the liability of two or more persons, which is joint and not several, can arise only out of a joint contract, and a breach of trust is not a breach of contract, but in the nature of a tort. Hence it is probably not necessary in suits founded upon ordinary breaches of trust, and certainly not in those founded on tortious breaches, to make parties all the trustees participating in the breach. The action in such cases resembles that in tort at law. *2 Pom. Eq. Jur.* § 1081 and note and cases; *Lew. Trusts (Flint's ed.)* \*908, \*909; *Hill Trust.* \*520, \*521; *2 Perry Trusts* § 879; *Story Eq. Pl.* § 213 and note; *Calv. Part.* 299, 300; *Attorney-General* v. *Wilson, Craig & P. 1* (at *p. 28*); *Cunningham* v. *Pell, 5 Paige 607, 612; Miller* v. *Fenton, 11 Paige 18; Walker* v. *Symonds, 3 Swan 75; Wilkinson* v. *Dodd, 40 N. J. Eq. (13 Stew.) 123; In re Davison, L. R. 13 Q. B. Div. 50 (1884)* ; *Ex parte Adamson, In re Collie, L. R. 8 Ch. Div. 807, 819, 820 (1878)*, where the learned judge says:

"In cases of fraud, or breach of trust, which is often only one form and instance of fraud, there never was any division of liability between the tort feasors. Every person participating in the tort was liable to make good the whole. The liability of each in equity was for the whole amount. And the proof in bankruptcy was exactly commensurate with that liability, it being the established rule in bankruptcy that every debt which a person could, either in his own name or in the name of any other person, recover at law or in equity was a provable debt in bankruptcy. It is said in the books that debts due by reason of fraud or breach of trust are joint and several. There is here a slight

inaccuracy.   Of course, tort feasors may be sued all in one action or in several actions, but there is not really or practically any joint liability as distinct from the several liability, except where there is a partnership and a joint estate."

The application of these principles to this case produces the following results:

In the matter of Lake Grinnell, Mr. Force acted without concert with Professor Cook, and instead of having the survey and return signed by Professor Cook as surveyor-general, he signed them as deputy surveyor-general, and assisted Stanton and his associates, including himself, in converting the lake to their use. His duty to complainant was to decline to certify to the return in favor of Stanton, and thereby prevent the title vesting in that gentleman.   Instead of that he recognized the survey of Roome, and assisted the syndicate in procuring the rights of location necessary to complete the transaction.   All the time he must have known that the affair would not receive the sanction of the council of proprietors if submitted, as it should have been, to that body.   And further, he evidently feared that it would not receive Professor Cook's sanction.   Here there was a tortuous breach of trust, resulting in the loss to the complainant of this lake.   For this breach complainant claims the value of the lake, viz., $3,000, less $150, the cost of the Kongleton lot sold with it. That such was its value is shown by its sale for that sum.

Against this view it is urged that Mr. Force was obliged to expend, and did expend, considerable money in carrying the transaction through, namely, the cost of the warrants of location and the amounts paid to McCoy and other members of the syndicate for their services, and so forth.   But none of these were necessary expenditures in order to carry through a sale directly by the proprietors to Mr. Burt or to the ice company.   They were necessary, if at all, only for the purpose of defeating or avoiding the direct sale to Mr. Burt, which would have resulted from permitting the negotiations based upon Ryerson's survey to be completed in the natural course of business.   It was Mr. Force's duty, as a member of the executive committee, to carry on these negotiations and procure from Mr. Burt or the ice company, or both, the best price he could get.   The legal presump-

tion is that if he had done his duty in that behalf he would have obtained for the complainant the sum which he realized for himself from the ice company and Burt, namely, $2,850. Had he done this he would have been entitled to compensation for his services. As, however, he did not do his duty, but the contrary, he is, in accordance with well-settled principles, entitled to no compensation.

I am therefore of the opinion that Mr. Force's estate is liable to pay to the complainant the sum of $2,850, with interest from the time he received the check from the ice company.

The cases of Upper White pond and Dunker's pond are very simple. In each case the survey was made by Mr. Roome, and the proceeds of sale were divided with Professor Cook. Both transactions were clear breaches of trust. I think Mr. Force must be charged with the full amount in each case, less the amount paid to Roome for making the surveys.

There remains to be considered the question of compensation to Mr. Force for his services in making the several sales of beach property.

In those matters he does not appear to have been guilty of any breach of trust or other misconduct, except what may be inferred from his manipulation with regard to the sixty per cent. contract, and the point taken by complainant's counsel in argument on that point is, in my judgment, not sustainable.

In my judgment, Mr. Force is not entitled to any compensation out of the first sale of $2,600 to Culver & Wright over and above what he has already received, namely, $100.

For the balance of the sales, I think his compensation should be arrived at as follows: Ascertain the total amount paid out by the complainant for surveyors' fees in searching, plotting and field work, not including that paid in connection with the first sale to Culver & Wright just mentioned, but including all that was done in searching for lands along the coast, in Sussex, Morris and Passaic counties, and on the Newark meadows; also ascertain the amount actually paid to Mr. Thomas for his services in assisting in the sales; deduct those from the total amount of the sales, not including the first sale made to Culver

& Wright; ascertain the net balance and credit one-half of it to Mr. Force.

If counsel cannot agree upon the figures for this account there may be a reference to a master to state it upon the principle just stated and to ascertain the balance due from Mr. Force upon that basis.