The complainant, owner of Lake Owassa (Long Pond) in Sussex county, seeks to restrain owners and occupants of summer cottages surrounding the lake from fishing, boating and bathing in the lake. The defendants are eighty in number.
The answering defendants deny the complainant's title, and, all but one, set up that they have an easement of boating and bathing in the lake by adverse user of their predecessor in title and themselves for twenty years and more, those on the northerly and easterly side of the lake claiming by prescription to one Allen, their common grantor, those on the southerly side, to Beardall, their former owner. One of *Page 191 
the defendants boldly claims the lake by adverse possession and sets up the statutes of limitation.
Seven of the defendants also set up that they have maintained docks on the lake adversely for twenty years and upwards and thereby acquired the right to fish, boat and bathe in the lake. The defendants, other than the dock owners, seem not to claim the right to fish, and the dock owners claim that right as an appurtenant to the docks. The dock owners' rights, as such, are not presently involved. The jurisdiction of equity to order the removal of the docks is reserved for further argument.
The complainant's chain of title runs back to the proprietors of East Jersey and has its origin in a warrant of May 15th, 1838 (thirteenth dividend), to John Rutherford for four thousand three hundred ninety-four and fifty one-hundredths acres "to be located in any part unappropriated in the eastern division of New Jersey except Romopock and the Sussex allotments," and a return on the 12th day of March, 1848, by the surveyor-general "embracing all that pond commonly known by the name of Long Pond excepted out of lots Nos. 46 and 47 of the Sussex allotment," described by metes and bounds. The chain of title from Rutherford through mesne conveyances to the complainant is admitted.
Objection is made that the pond is within the Sussex allotments and consequently that the return was without warrant. Long Pond was not in the Sussex allotment. It appears by the return that lots Nos. 46 and 47 formed a part of the Sussex allotment; Long Pond did not, it had been excepted.
Another objection is that on October 5th, 1813, the board of proprietors resolved that "no long or narrow survey be made including meadows or swamps or any other survey whatever comprehending water, rivers, brooks or creeks, without including a proper quantity of land on each or either side thereof unless there shall be a particular order from the board of proprietors for the purpose." This resolution was modified in 1828 (minute book C page 273; see contra 72 N.J. Eq. 77) by omitting "water" so that it applied only to rivers, brooks and creeks at the time of the warrant to John Rutherford *Page 192 
in 1838. Long Pond, obviously, was none of these. Further, not only would the proprietors be estopped from disputing the title after this long lapse of time (General Proprietors of theEastern Division v. Force's Executors, 72 N.J. Eq. 56; Baeder
v. Jennings, 40 Fed. Rep. 199), but by their deed of July 16th, 1931, they quitclaimed to the complainant any supposed right they may have had in Long Pond. The title is unassailable.
In 1907-8-9 Frank B. Allen, a Newark lawyer, purchased several tracts of land on the northerly and easterly side of the lake and sold them in building lots. John P. Beardall bought on the south side, and later formed a land company through which he subdivided the tract into building lots; when, does not appear.
The region was a wilderness until the defendants began to build and settle around the four-mile border of the lake within the past ten or fifteen years; none has been there twenty years. The lake was the attraction; fishing, swimming and boating was their recreation, as it had been, time out of memory, for the knowing, near and far, looking for that form of sport in the hot weather period. The lake was a "free for all" in the pastime, as they believed, unmindful of private ownership and without thought or intention of denying the proprietary right of the owner. Beardall used the lake in common with the rest of the public. There is no evidence that he occupied his property, nor anything indicating that he used the lake as incident to his land, and Allen surely did not for, when he occasionally fished in the lake, he came from Bernardsville forty miles away or from Branchville a mile and a half distant, where he lived at times in the summer months.
The circumstances are similar to those that prevailed in Cobb
v. Davenport, 32 N.J. Law 369. There such general use of the lake was deemed to be permissive and, without more, could not ripen into a disseisin; that the use by adjoining and adjacent property owners was as members of the public, not as appurtenant to their land; that the use raised no presumption of a lost grant to their predecessor in *Page 193 
title, and, consequently there was no prescriptive right in them. That case, it is true, involved the right of a profit aprendre, but the principles of adverse user and of prescription as they apply in the development of that right are pertinent to the acquisition of a pure easement of boating and bathing; and, as the settled law in this state (Albright v. Cortright,64 N.J. Law 330; Mitchell v. D'Olier, 68 N.J. Law 375) are to be followed and applied.
The defendants have no rights in the lake in virtue of their grantors, for the grantors had none. If it could be said that as owners of cottages, lured to the vicinity by the advantages of the lake, they could acquire easements appurtenant to their summer dwellings, they are short of the time required by law for vesting by adverse possession.
And if it were held that both Allen and Beardall were possessed of easements appurtenant to their lands, and they and the members of their families had the right to boat and bathe in the lake, the severance of their lands into many parcels and to many owners would not carry to each of them the easements. This was ruled inBower v. Hill, 2 Bing. N.C. 339; 132 Eng. Rep. 133, where Lord Tyndal said, "we think, however, such a construction of the [implied] grant would lead to very unreasonable consequences, * * * and the consequence would be, if the plaintiff were held to be entitled to the right of passage, that two different persons would be entitled to use it for themselves and their servants with boats and barges, or indeed as many different persons as possessed any share of the frontage. This would be an unreasonable construction against the grantor, who may have been contented to grant the right to the occupier of the King's Head inn and yard, from his knowledge of the degree of user which would follow from the grant when so limited."
The defendants raise the question of jurisdiction, objecting that, having disputed the complainant's title, it must be determined in the law courts before equity can take cognizance. Jurisdiction does not depend upon an established title at law. The case is not of the type where equity intervenes to ascertain the extent of legal rights established at *Page 194 
law and to enforce or protect them. Upon a bill of peace, to quiet the possession, jurisdiction resides in equity to save the vexation and expense of a multiplicity of suits at law against a class of defendants, for the same cause for action. It comes within the ninth classification of equity's jurisdiction given inHart v. Leonard, 42 N.J. Eq. 416: "Where the object of the bill is to prevent a multiplicity of suits, otherwise rendered necessary by the fact that many persons are interested in the controversy." In the case cited in support of the text (Britton's Adm'r v. Hill, 27 N.J. Eq. 389) this court entertained a bill to restrain fifteen defendants from taking oysters from the complainant's staked-off oyster beds in Raritan bay, the defendants claiming that the ground was a natural oyster bed and that they were entitled to the oysters as of public right. The "Case of the Fisheries" (Mayor of York v.Pilkington), 1 Atk. 282, is also an example. There a bill was filed to restrain riparian owners from fishing in the complainant's fishery. The Lord Chancellor first sustained the demurrer for want of an established title at law and for misjoinder, and then overruled it expressly upon the equity jurisdiction to prevent a multiplicity of suits at law, though the defendants claimed under distinct and separate rights.
While an established title at law is not a prerequisite to jurisdiction, title in the complainant is, of course, indispensable to a recovery, and were the title in substantial dispute, in the circumstances, upon proper demand, the question would be sent to law for a verdict upon a feigned issue, to guide the chancellor in the determination of the issue of trespass, as was done in Lake Lenore, Inc., v. Delaware, Lackawanna andWestern Railroad Co., 113 N.J. Eq. 533, where jurisdiction was invoked to prevent the destruction of the inheritance, and, upon holding that the establishment of the complainant's title at law was not jurisdictional, relief was granted upon the verdict of a jury on a feigned issue.
If the present suit were against a single defendant, to prevent repeated trespasses on the lake, no doubt a substantial dispute of the rights of the parties to the possession of the lake would have to be settled at law before equity would take *Page 195 
cognizance, but to require eighty suits for the same character of wrong, for an inadequate recovery, and at enormous pains and expense, before equity lent its aid, would be tragic and a travesty upon justice. In Eldridge v. Hill, 2 Johns. Ch. 281, Chancellor Kent said that "a bill of peace, enjoining litigation at law, seems to have been allowed only in one of these two cases; either, where the plaintiff has already, satisfactorily, established his right at law, or where the persons who controvert it are so numerous as to render an issue, under the direction of this court, indispensable to embrace all the parties concerned, and to save multiplicity of suits." The bill is peculiarly within the latter case: The cause for action, trespass, is common against all the defendants; their defenses are common to all, disseisin by adverse users; and although the prescriptive rights asserted by them are in separate que estates, Allen's and Beardall's, the fiction of a lost grant in their respective predecessors in title offers no distinct defense precluding the convenient joining of all the defendants in a single bill, for, in fact, they are common offenders, justifying under a common claim of adverse possession.
The jurisdictional ground upon which the bill is maintained is not counter to the accepted rule of practice laid down inMarselis v. Morris Canal and Banking Co., 1 N.J. Eq. 31, and followed in Hinchman v. Paterson Horse Railroad Co., 17 N.J. Eq. 75; Morris and Essex Railroad Co. v. Prudden, 20 N.J. Eq. 530; Lehigh Valley Railroad Co. v. McFarlan, 30 N.J. Eq. 135,
that equity will not entertain a bill where the rights of complainants or defendants are distinct and unconnected. That rule rests upon the inconvenience in a single trial of multifarious causes, a condition that does not here exist, except in such slight degree, in respect of the separately prescribed group rights, as not to interfere at the hearing. However, the objection for misjoinder of the two groups was not raised in the pleadings and it is not now available. Misjoinder must be pleaded. Annin v. Annin, 24 N.J. Eq. 184. If convenience demands, the court may upon its own motion strike a bill for multifariousness. *Page 196 
The complainant is entitled to a decree enjoining the defendants from trespassing upon the lake and fishing, boating and bathing.